Filed 9/10/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | G048425 |
| v. | (Super. Ct. No. 12NF3284) |
| DANIEL ALVAREZ, JR., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from an order of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed as to Defendants and Respondents Daniel Alvarez, Jr., and Michael Abel Cisneros.  Reversed as to Defendant and Respondent Juan Jose Renteria.

Tony Raukauckas, District Attorney and Anna M. Chinowth, Deputy District Attorney for Plaintiff and Appellant.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Respondent Daniel Alvarez, Jr.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Respondent Juan Jose Renteria.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Respondent Michael Abel Cisneros.

This is an appeal by the Orange County District Attorney following a dismissal of robbery charges against defendants Daniel Alvarez, Jr., Juan Jose Renteria, and Michael Abel Cisneros.  The defendants brought a motion to dismiss the case based primarily on *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), arguing the prosecution and the police had failed to preserve evidence from two police controlled cameras in the vicinity of the robbery.

The trial court determined on the night of the incident in question, one of the defendants, Cisneros, specifically asked the senior officer on the scene, a detective, to check any relevant video.  The detective replied, "If I had video cameras of what took place, that's part of my job.  My job is not to arrest people that aren't guilty of something."  Yet the detective later admitted he had never reviewed the video himself, nor asked anyone else to do so.  He asserted it was not his responsibility.

The court also found the issue of retaining video was raised during a hearing shortly after the defendants' arrest, giving the prosecution notice the defense wanted to review any available video evidence.  Given these facts, and the others we discuss below, the trial court granted the defendants' motion to dismiss.  We conclude the court correctly dismissed the cases of defendants Cisneros and Alvarez, but substantial evidence does not support the court's factual findings as to Renteria.  We therefore affirm as to Cisneros and Alvarez and reverse as to Renteria.

I

FACTS AND PROCEDURAL HISTORY

On October 15, 2012, a felony complaint was filed alleging the defendants had violated Penal Code sections 211 and 212.5, subdivision (a), which included allegations of prior convictions as to Cisneros.[1]  All three defendants pled not guilty.

---

[1] On October 23, an amended complaint was filed alleging Cisneros committed six prior serious and violent felony convictions under Penal Code section 667, subdivisions (d), (e)(2)(A), and section 1170.12, subdivisions (b) and (c)(2)(A).  One prior serious felony

## A. Initial Hearing

The preliminary hearing was apparently initially scheduled for October 16, 2012. On that date, there was a request by the prosecution to trail the hearing until October 29. During the hearing, the issue of subpoenas for private video from the surrounding areas was raised by Cisneros's counsel. Subpoenas for video had been served on two nearby private establishments, but nobody appeared on behalf of either. Counsel requested bench warrants. The court declined to issue warrants, indicating there might be a notice problem. Counsel then requested an order that *any* video be preserved.

The prosecutor interjected at that point and stated, "I informed [Cisneros's counsel] that we are willing to comply with PC [1054.1]. And in regards to the videos, we had already requested those be held. [¶] I'm opposed to any kind of warrant going out at this point in time, and the People are already in the process of obtaining the videos. [¶] I think that's the appropriate way to go about getting the evidence. [¶] At this point in time, there's no possibility that they are going to be destroyed. We're within 30 days." The court indicated that given the notice problem, the defense's request for bench warrants could not be granted in any event.

## B. Evidence from the Preliminary Hearing

The preliminary hearing was held on October 29. According to the evidence given at the hearing, at about 1:30 in the morning of October 14, 2012, Jose C. and a companion[2] left an establishment called Revolucíon in Fullerton.[3] As Jose C.

---

under Penal Code section 667, subdivision (a)(1) was also alleged. A minor amendment by interlineation, striking certain language, was subsequently approved by the court.

[2] Jose C.'s companion is unidentified in the record and was described by police as "uncooperative," and "belligerent." He interfered with the police as they were attempting to take a report.

walked through the parking lot, he was approached by approximately "five male Hispanic gang types." According to Jose C., Renteria then snatched a gold chain, worth about $3,200, from around his neck. Renteria and his codefendants made threatening statements, asking Jose C. what he was going to do about it. All three defendants said they were "from the neighborhood." Jose C. felt that due to the number of individuals present and threatening him, he would be assaulted if he tried to retrieve his property.

After the chain was taken, Jose C. followed the robbers, eventually flagging down a marked police vehicle. Jose C. thereafter spoke to Officers MacShane and Haynes of the Fullerton Police Department (FPD). Chris Wren, a detective with the gang unit, also responded. Jose C. pointed out the three defendants, who were by that point being detained nearby, to Wren. A search of the area resulted in the recovery of the gold chain about 50 feet away. Wren did not know if nearby establishments had video cameras, and he did not take any steps to secure the video. At the conclusion of the preliminary hearing, the defendants were held to answer.

## C. The Trombetta Motion and Hearing

On December 24, Cisneros filed a motion to dismiss pursuant to *Trombetta*. He argued the police department possessed evidence that would have exonerated him and Alvarez, but the police allowed the evidence to be destroyed. The motion alleged that at the scene, after all three defendants had been detained, "Officer MacSh[a]ne had a "lengthy conversation" with Jose C. repeatedly asked Jose C. "several different ways"

---

[3] As best we can tell from the exhibits and testimony, this incident took place in a shopping area with businesses on three sides, adjacent to the respective streets, and a reasonably large parking lot in the middle. The streets are Malden to the west, Wilshire to the north, Harbor to the east and W. Amerige to the south. The businesses border the streets except for W. Amerige, and the parking area is in the center, bordering W. Amerige. Revolucíon is closest to Harbor, and Back Alley Bar, which is referenced several times, is closest to Wilshire. There is a pedestrian walkway between the block of buildings closest to Wilshire and the buildings closest to Harbor.

4

whether "Mr. CISNEROS and Mr. ALVAREZ . . . 'backed up' Mr. RENTERIA . . . until Jose C. implicated Mr. CISNEROS and Mr. ALVAREZ in the robbery of Jose C."

The motion also asserted that after his arrest, Cisneros "once again denied any involvement in the incident, and pleaded with Officer Wren to get the videos," apparently referring to video from surrounding cameras. "[T]hose videos would show that Mr. CISNEROS and Mr. ALVAREZ had no involvement in the theft of the necklace." The motion stated that Wren replied, "if I had video cameras of what took place, that's part of my job. My job is not to arrest people that aren't guilty of something."[4]

The motion further alleged the FPD maintained at least two cameras that covered the crime scene, and although the defendants were taken to the FPD, the investigating officers failed to review or preserve the camera data. Cisneros argued the failure to preserve the camera recordings violated both *Trombetta* and *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*).

In opposition, the prosecution argued Cisneros had not shown the evidence actually existed, or had been lost or destroyed in bad faith. Cisneros had not, the prosecutor argued, produced admissible evidence to show that any cameras maintained by the FPD covered the relevant area. The prosecution asserted it was unaware that any videos had ever existed, and if they did, whether they had been destroyed. Even if they had, negligence did not require dismissal. Alvarez and Renteria moved to join Cisneros's motion without opposition.

In April 2013, the court began an evidentiary hearing on the motion. Gary Sirin, a detective in the FPD's high-tech crimes unit, maintained and controlled cameras located in Fullerton. He testified that at the time of the incident in this case, the FPD had

---

[4] As we will discuss shortly, this claim is supported by a partial transcript from Wren's personal recording device.

nine cameras in the downtown area, which recorded to a server located at city hall. The areas where the cameras were located were "high-concern areas" for potential crime. One of the cameras was placed in the parking lot where the robbery occurred. The camera system was used pursuant to a written policy by the FPD, and the cameras generally retained their footage for two to two and one-half weeks.

The cameras were accessible to the FPD at all times, but not always monitored. Both the watch commander and dispatch had viewing stations, so if an officer in the field needed to inquire about an event, dispatch could inform the officer if the area was covered by a camera. The cameras could be moved and zoomed manually, though they did on occasion malfunction and move on their own. Sometimes if a camera was moved, it would not always be moved back to its original location. It is therefore possible for something to occur but not be caught by a camera because of where the camera was pointed at the time. At times, the cameras did capture largely useless footage of a dumpster or a tree.

If an officer wanted to view camera footage, he or she could request to do so via e-mail or phone. Officers were typically aware that footage was only available for a fairly short amount of time. Sirin did not receive a request from any of the officers involved to view footage related to the instant case. By the time he received a request from Cisneros's attorney, the footage had been deleted. The request was most likely made within just a few days of the time the footage had been overwritten. Sirin provided footage to Cisneros's attorney demonstrating the general coverage of the cameras, two of which included coverage of the parking lot where the robbery had occurred behind the Back Alley Bar.

Officer MacShane was one of the officers on the scene the night of the robbery. Jose C. told him the incident had occurred in the parking lot behind the Back Alley Bar. MacShane was somewhat familiar with the video surveillance system. He

was aware of the cameras in the vicinity of the incident, and he knew he could request video from the watch commander or dispatch. He did not recall Cisneros asking him to review video of the robbery, and he was not sure if he had requested video of the incident, although he thought he had. He did not reference any such request in his report, which is something he would typically do. He did not know if the cameras were pointed in a direction that would have helped with his investigation on that particular night.

FPD Sergeant Robert James, who was watch commander on the night in question, testified in a manner largely similar to Sirin with regard to the general use of the cameras. Generally, the FPD tried to focus the cameras on "the most fruitful areas." As relevant here, James testified there were two cameras pertinent to this incident. One of them was generally focused on a pedestrian area to the east of the Back Alley Bar, closer to the buildings near Harbor. The FPD refers to this area as "the triangle" due to its shape. Another camera is located on the south side of W. Amerige, and the police try to keep it focused on a north/south pedestrian crossing on W. Amerige. What is covered at any particular time is variable, but that is where the FPD generally tried to focus the cameras. He did not know exactly where the cameras were pointed on the night in question.

Wren testified next. With respect to where the robbery took place, Jose C. told him it was the east side of the parking lot. He acknowledged he did not take any steps to review video from the scene, either private footage or FPD footage. He initially did not recall Cisneros asking him to pull the video from the cameras, although it would not surprise him if someone had said that. When confronted with the recording of the exchange, he recognized his voice on the recording where Cisneros specifically asked him to do so. The tape of this exchange, edited as relevant here, was played in court:

"[Cisneros]: You guys know we didn't do anything, man.

7

"[Wren]: No, we don't know. You know why we don't know? 'Cause none of us were there.

"[Cisneros]: Check the cameras, dude! There's gotta be cameras around here, man.

[¶] . . . [¶]

"[Wren]: I'm telling you right now. If I had video cameras of what took place, that's part of my job. My job is not to arrest people that aren't guilty of something. . . ."

Cisneros continued repeating he had not done anything. Wren testified when he responded to Cisneros it was his responsibility to retrieve video if it existed, he was referring to the agency as a whole, and not himself in particular. He was not the investigating officer in the case, but merely went to the scene to assist. It would have been the robbery detective eventually assigned to the case who would be responsible for reviewing any relevant video. Wren stated that with "the completion of the [police] report itself [the case] gets assigned to an investigating detective. That in and of itself is a request to check for video."


*D. Argument and Ruling*

At the conclusion of the hearing, the court discussed the case at length with counsel before ruling. The court began by noting the duty to retain material is narrower than the duty to disclose. If the unretained evidence is believed, based on "common sense and information in front of us . . . to play a significant role in the defendant's case," then *Trombetta* is relevant. Unlike a failure to disclose under *Brady*, the court noted, under *Trombetta*, whether a failure to retain rises to the level of a due process violation depends on whether the police and/or prosecution acted in good faith.

The court characterized this case as follows: "This is a serious issue. There is a lot at stake. We have three defendants. We have a Fullerton Police Department who

8

appeared, at least, to have a major presence at the scene, interviewing witnesses, talking to people and so on." Shortly after the incident, Cisneros's counsel appeared in another courtroom, "asking for anything he can get that might accomplish securing the video footage," and at that point, the prosecutor informed the court that the People were certain that no footage would be destroyed. The prosecutor pointed out that statement was in the context of the private business footage Cisneros was seeking, but the court replied "videos are videos . . . [let's not] jump to any conclusions on anything yet."

Sirin, whom the court found very credible, had testified the area in question was high crime. Sirin was familiar with the cameras and where they were. He testified he did not receive a request for video from the night of the incident after the hearing about the private cameras. That, the court said, was "not a good thing." Moreover, the court felt that some of the officers, including MacShane, "didn't have a clue as to the video policy." Wren had initially testified he failed to recall if Cisneros had requested he review any video; the transcribed recording revealed that he had. Thus, the court believed two requests to maintain the video for review had been made — on the night of the incident, and during the subsequent hearing. The court therefore concluded a sufficient request to maintain the video was made.

The court also discussed the evidence regarding the cameras and where they were pointed, noting "There [are] a lot of moving parts to this while situation." No evidence had been produced that the cameras were pointed at the area where the robbery occurred. But the court, analogizing to the instructions juries were given on similar factual issues, said that courts instruct juries to use their "common sense and reasonableness." Therefore, "I think at that time . . . night, by a bar, in a high-crime-rate area, it would be silly to assume . . . that the cameras were pointing at trees or the ground." The court felt this was a "red herring" issue.

Wren, the court noted, was the senior officer on the scene. He knew there were cameras in the area. Cisneros specifically asked him to check the cameras. Wren responded it was part of his job. "Well, if it's part of his job, . . . why in the world isn't he at least making an inquiry of somebody? They have radios, they have communication, we have cameras here." The court did not know why Wren declined to immediately investigate further. But nobody did. "I'm perplexed on this. I truly am perplexed on it. And [Wren] goes out of his way to tell [Cisneros] . . . 'Don't worry. This is my responsibility.'" On the witness stand, Wren said it was his agency's responsibility. "He acknowledged it. So no one is denying any of this stuff. [¶] Nobody directed anybody to do anything." The court believed it was likely that the prosecutor at the hearing in October 2012 had actually made a request to the FPD to preserve video, but it had not been acted upon.

The prosecution's position was the defense had failed to show the video evidence would have been exculpatory. Cisneros's counsel argued the video could have been used to differentiate between different levels of culpability between the defendants. The prosecution felt this case was different from one in which an identification was made later; here, the identification was made at the scene, and the chain was found very close to the defendants. Therefore, given the proximity, the officers could reasonably have felt the video was less likely to be exculpatory. James, the watch commander, had testified the FPD generally tried to focus the cameras on the "most fruitful areas" right behind the bars adjacent to the parking lot where the robbery occurred. None of the witnesses had personal knowledge regarding where the cameras were pointed on the night in question. Therefore, the prosecutor argued, the defense had failed to prove the evidence actually existed or that it was material.

The court indicated there was evidence the cameras did work, and while there was evidence they could at times be pointed toward irrelevant areas, "this goes into

10

my good grief category of you have a bar, active, high-crime-rate area, gang area, actually, to a degree also. . . . [T]his seems to be a very, very active area with police activity. And I don't even think it would be a leap of faith . . . to assume the cameras were not pointing downward. [¶] I'll be very candid, I find this entire case disturbing." With that, the court granted the motion and dismissed the charge as to all defendants.

II

DISCUSSION

*A. Legal Background*

The prosecution's duty to disclose and retain evidence stems from the due process clause of the United States Constitution, as explained and interpreted by the three leading United States Supreme Court decisions on this subject — *Brady*, *supra*, 373 U.S. 83; *Trombetta*, *supra*, 467 U.S. 479, and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*).

*Brady* is the leading case on the prosecution's duty to disclose exculpatory evidence. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) Such evidence must be disclosed if it is material, that is, if there is a reasonable probability the evidence might have altered the outcome of the trial. (*United States v. Bagley* (1985) 473 U.S. 667, 682.)

The duty to retain, rather than simply disclose, potentially exculpatory evidence is somewhat different. *Trombetta* concerned a driving under the influence case involving two drivers. The *Trombetta* court found that although breath samples taken from the defendant had not been preserved, the test results were nonetheless admissible. The court rejected the defendant's argument that the state had a duty to retain the samples for a number of reasons. The police officers were acting in good faith and according to

11

normal procedure, the chance the samples would have been exculpatory were slim, and defendants had other means to prove their innocence. (*Trombetta*, *supra*, 467 U.S. at pp. 488-490.) "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id.* at pp. 488-489, fn. omitted.)

*Youngblood*, the most recent of the three cases, explains the requirements for demonstrating a due process violation based on the failure to retain evidence under somewhat different circumstances. *Youngblood* was a sexual assault case in which the state had failed to properly preserve fluid samples from the victim's clothing and body. Unlike the situation in *Trombetta*, where the evidence was destroyed after all relevant testing was complete, in *Youngblood*, only limited testing was initially performed to determine whether sexual contact had indeed occurred. (*Youngblood*, *supra*, 488 U.S. at p. 53.) By the time more rigorous testing was attempted, it was no longer possible, because the victim's clothing had been improperly refrigerated. (*Id.* at p. 54.) The defendant's principal argument was mistaken identity, and he argued that if the victim's clothing had been properly preserved, the physical evidence might have exonerated him. (*Ibid.*) The defendant was found guilty, and ultimately, the Supreme Court upheld the conviction.

The court stated: "The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to

12

preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Youngblood*, *supra*, 488 U.S. at p. 57.) As explained in *Trombetta,* the court noted the problematic nature of determining the materiality of permanently lost evidence. The court also declined to impose on the police an absolute duty to retain and preserve anything that might possibly have some significance. (*Id.* at p. 58.)

Accordingly, "We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Youngblood*, *supra*, 488 U.S. at p. 58.) The court held that at worst, the conduct of the police in *Youngblood* could at best be characterized as negligent. (*Ibid.*)

Thus, there is a distinction between *Trombetta*'s "exculpatory value that was apparent" criteria and the standard set forth in *Youngblood* for "potentially useful" evidence. If the higher standard of apparent exculpatory value is met, the motion is granted in the defendant's favor. But if the best that can be said of the evidence is that it was "potentially useful," the defendant must also establish bad faith on the part of the police or prosecution. (See *Youngblood*, *supra*, 488 U.S. at p. 58; *Trombetta*, *supra*, 467 U.S. at pp. 488-489.)

The Supreme Court applied the *Youngblood* test again in *Illinois v. Fisher* (2004) 540 U.S. 544. The evidence in question was a substance that had been tested four times and had been determined to be cocaine. The defendant remained a fugitive for more than 10 years, and by the time he was arrested and prosecuted, the evidence had

13

been destroyed and could not be retested. "At most, respondent could hope that, had the evidence been preserved, a *fifth* test conducted on the substance would have exonerated him." (*Id.* at p. 548.) "[T]he applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence" and therefore *Youngblood's* bad-faith requirement applies. (*Id.* at p. 549.)

The California Supreme Court summarized the requirement to retain evidence and when the failure to do so violates due process as follows. The prosecution's "failure to retain evidence violates due process only when that evidence 'might be expected to play a significant role in the suspect's defense,' and has 'exculpatory value [that is] apparent before [it is] destroyed.' [Citation.] In that regard, the mere 'possibility' that information in the prosecution's possession may ultimately prove exculpatory 'is not enough to satisfy the standard of constitutional materiality.' [Citation.] And whereas under *Brady*, *supra*, 373 U.S. 83, the good or bad faith of the prosecution is irrelevant when it fails to *disclose* to the defendant material exculpatory evidence [citation], a different standard applies when the prosecution fails to *retain* evidence that is potentially useful to the defense. In the latter situation, there is no due process violation unless the accused can show bad faith by the government. [Citation.]" (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8.)

We review the trial court's decision on a *Trombetta/Youngblood* motion under the substantial evidence standard. (*People v. Montes* (2014) 58 Cal.4th 809, 837; *People v. Memro* (1995) 11 Cal.4th 786, 831.) "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value . . ." in support of the court's

14

decision. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]"' [Citation.]" (*Ibid.*)

Therefore, we adopt the following as our analytical approach. First, did the destroyed evidence meet either the "exculpatory value that was apparent" or the "potentially useful" standards for materiality under *Trombetta* or *Youngblood*, respectively? (See *Youngblood*, *supra*, 488 U.S. at p. 58; *Trombetta*, *supra*, 467 U.S. at pp. 488-489.) Second, if the evidence qualified as "potentially useful" under *Youngblood* but did not meet the *Trombetta* standard, was the failure to retain it in bad faith? (*Youngblood*, *supra*, 488 U.S. at p. 58.) Because they are differently situated, we address Cisneros and Alavarez separately from Renteria.

## B. Cisneros and Alvarez

### 1. Materiality

As we discussed above, *Trombetta* defines material evidence as that which "might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, [citation] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta*, *supra*, 467 U.S. at pp. 488-489, fn. omitted.) Under *Youngblood*, the standard is whether the destroyed evidence, had it been subjected to analysis, was "potentially useful" to defendants. (*Youngblood*, *supra*, 488 U.S. at p. 58.)

In his motion, Cisneros referred to MacShane's conversation with Jose C., which he essentially characterized as repeated attempts by MacShane to encourage the

15

victim to point the finger at he and Alvarez. In effect, Cisneros claimed he needed the unblinking, neutral eye of the video cameras to counter the false notion MacShane planted with Jose C. that Cisneros and Alvarez helped Renteria commit the robbery. The videos therefore also would aid Cisneros by showing Wren mistakenly relied on Jose C.'s false claim, suggested by MacShane, that Cisneros and Alvarez "made threatening statements," showing their intent to abet the offense. Cisneros practically begged Wren to "Check the cameras, dude!" Cisneros claimed the video footage would show "we didn't do anything," and "I didn't even see it, man!" The FPD was thus given prompt notice that Cisneros believed the video to be important evidence that could exculpate he and Alvarez.

We use the word "exculpate" rather than "exonerate" intentionally. As a layperson, Cisneros may well have believed that if he was not the individual who snatched the gold chain, he was in no legal jeopardy. That, of course, is not true — Cisneros could still be liable as an aider and abettor, for example. But it is certainly possible that the video would have demonstrated that Cisneros and/or Alvarez had some lesser degree of culpability. Perhaps one or both of them was more appropriately charged as an accessory. (Pen. Code, § 32.) Perhaps the video would demonstrate this was really a theft (Pen. Code, § 487) rather than a robbery. Such facts would be relevant to the punishment of the defendants, but particularly pertinent to Cisneros, who has six prior strikes on his record. In a worst case scenario, he could have been facing a 25 to life sentence if he were convicted of robbery, which might not be the case if he were found guilty of a lesser charge. Evidence may be material if the evidence is relevant as to either guilt or punishment. (See *Brady*, *supra*, 373 U.S. at p. 87.)

The prosecutor's primary contention is there is no guarantee the cameras were pointing where they were supposed to be, and therefore neither the apparent exculpatory value nor the potential usefulness of the video could be established. The

16

court rejected this argument, and we find the court's conclusion on this point was supported by substantial evidence. FPD officers testified the cameras were located in high-crime areas. The FPD tried to focus the cameras focused on "the most fruitful areas." One of those areas was the parking lot, where one of the cameras was stationed, and another was directly across the street. Thus, the trial court's inference that the police would try to keep the cameras pointed where they would be the most useful was reasonable in light of the evidence. Further, it was a reasonable inference from the testimony that at least one of the cameras would have captured the incident.

This case has similarities to *U.S. v. Cooper* (9th Cir. 1993) 983 F.2d 928 (*Cooper*). In that case, the defendants were charged with conspiracy to manufacture methamphetamine. (*Id.* at p. 930.) After searching the premises, various pieces of equipment were destroyed and put into large drums pursuant to Drug Enforcement Agency policy. (*Ibid.*) The government was aware the drums would only be stored for a short time before destruction. (*Ibid.*)

The defendants contended they were engaged in lawful manufacturing activity. (*Cooper*, *supra*, 983 F.2d at p. 929.) They argued the government's destruction of the entire lab deprived them of the ability to establish their defense. The government offered no reasoning for its decision. Destruction of the evidence occurred after government investigators knew the nature of the defense and after the defendants had made several requests for return of the equipment. (*Id.* at p. 931.)

"Agents involved in the search knew that the lab was ostensibly configured to make [a legal chemical]. In conversations following the seizure, agents repeatedly confronted claims that the equipment was specially configured for legitimate chemical processes and was structurally incapable of methamphetamine manufacture. In response to defense requests for return of the equipment, government agents stated that they held it

17

as evidence. This statement was repeated even after the equipment had been destroyed." (*Cooper*, *supra*, 983 F.2d at p. 931.)

The government did not challenge the defense's argument regarding the evidence's materiality or the bad faith of the law enforcement officers, instead arguing that comparable evidence was reasonably available. (*Cooper*, *supra*, 983 F.2d at p. 931.) The court rejected this argument and upheld the dismissal of the indictment. (*Id.* at p. 933.) "The defendants' version of the facts, which was repeatedly relayed to government agents, had at least a ring of credibility. They should not be made to suffer because government agents discounted their version and, in bad faith, allowed its proof, or its disproof, to be buried in a toxic waste dump." (*Ibid.*)

Similarly, here, the video had the potential to exonerate or considerably reduce the culpability of Cisneros and Alvarez. The FPD and the prosecution knew video existed and at least two requests were made to review or retain it. While we cannot say the evidence, apparently destroyed before it was ever reviewed, meets the *Trombetta* standard of possessing "exculpatory value that was apparent before the evidence was destroyed" (*Trombetta*, *supra*, 467 U.S. at pp. 489) we can readily say the video meets the standard set forth in *Youngblood* as "potentially useful" to the defendants. (*Youngblood*, *supra*, 488 U.S. at p. 58.) We must therefore also examine whether this case meets *Youngblood*'s bad faith requirement.

### 2. Bad Faith

If the evidence is "potentially useful" under *Youngblood*, we turn next to the question of whether the government acted in bad faith. (*Youngblood*, *supra*, 488 U.S. at p. 58.) We review the trial court's finding on the existence or nonexistence of bad faith under the substantial evidence standard. (*People v. Velasco* (2011) 194 Cal.App.4th 1258, 1262.)

18

The People suggest that at best, the FPD and prosecution were negligent. The trial court found it very troubling that Sirin had *never* received a request for the video from the night of the incident. The court found two requests for the video had been made — one from Cisneros, and the other from counsel at the initial hearing. Despite the request from Cisneros, Wren testified checking the cameras was not his job. The court stated: "I'm perplexed on this. I truly am perplexed on it. And [Wren] goes out of his way to tell [Cisneros] . . . 'Don't worry. This is my responsibility.'" On the witness stand, Wren said it was his agency's responsibility. "He acknowledged it. So no one is denying any of this stuff. [¶] Nobody directed anybody to do anything."

In addition to Cisneros's request on the night of the incident, defense counsel raised the issue of obtaining video just a few days later, on October 16. Although defense counsel was attempting to address the issue of video that might be obtained from private businesses in the area, the prosecutor interjected herself: "I informed [Cisneros' counsel] that we are willing to comply with PC [1054.1]. And in regards to the videos, we had already requested those be held. [¶] . . . And the People are already in the process of obtaining the videos. [¶] . . . [¶] At this point in time, there's no possibility that they are going to be destroyed. We're within 30 days."

We suspect, for a number of reasons, the prosecutor was referring not to the private video defense counsel was seeking, but the FPD video at issue here. But in any event, the prosecution was put on clear notice that obtaining any video from the parking lot was important to the defense.

The court determined the FPD and the prosecution were well aware of the potential usefulness of the video, and did nothing, despite their knowledge that the FPD's policy at the time was only to preserve video for a short period. If "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant" (*Youngblood*, *supra*, 488 U.S. at p. 58) and fail to preserve it, that shows bad

19

faith. Both Wren, on the night of the incident, and the prosecutor, at the initial hearing, acknowledged the potential usefulness of the video.

The FPD's conduct is as disturbing to us as it was to the trial court. When asked by Cisneros to review the video, Wren told Cisneros that it was "part of [his] job." In court, however, he first failed to recall Cisneros asking him to watch any video of the area. After his recollection was refreshed by the recording, Wren disclaimed all responsibility to follow up on the video, and had no idea who the individual responsible for doing so might be. When taken together with the prosecution's statement at the initial hearing that steps were being taken to preserve the video, this amounted to more than mere negligence; the trial court concluded this was bad faith, and that finding is supported by substantial evidence.

## C. Renteria

Unlike Cisneros and Alvarez, Renteria does not meet the standard of demonstrating the destroyed evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed. . . ." (*Trombetta*, *supra*, 467 U.S. at pp. 488-489, fn. omitted) or the lesser standard under *Youngblood* that the destroyed evidence was "potentially useful." (*Youngblood*, *supra*, 488 U.S. at p. 58.)

Renteria joined Cisneros's motion, but he never supplemented it in any fashion, and nothing in the motion suggested the videos held exculpatory value for him. Renteria never filled this gap with his own foundation to support his joinder in the motion. There was no basis to conclude that Cisneros's statement at the scene that "we didn't do anything" included Renteria. The context Cisneros furnished in his motion showed "we" meant Cisneros and Alvarez. Cisneros did not suggest Renteria was absent from the scene or wrongly accused, but rather only that Cisneros and Alvarez did not aid or abet the perpetrator. According to Cisneros, he and Alvarez had no involvement in the

20

offense. Indeed, they "didn't even see it," and therefore the videos were essential to rebut the contrary narrative allegedly planted by MacShane and recounted by Wren. But this factual foundation to demonstrate exculpatory value or even potential usefulness did not apply to Renteria.

Thus, we cannot conclude there was substantial evidence to support the trial court's conclusion that the evidence held the necessary materiality as to Renteria (see *People v. Montes*, *supra*, 58 Cal.4th at p. 837), and we need not consider the bad faith issue as to this defendant. We therefore reverse the court's order as to Renteria only.

*D. Remedy for Cisneros and Alvarez*

At the very end of its brief, the People offer a one-paragraph argument asserting dismissal was an inappropriate sanction. Only one case, which predates *Trombetta*, is cited. (*People v. Zamora* (1980) 28 Cal.3d 88, 99.) The People did not suggest any specific alternate sanction in the trial court and do not do so here. They merely argue that dismissal goes too far.

With respect to the proper remedy, courts have a large measure of discretion in determining the appropriate sanction for failure to preserve material evidence. (*People v. Memro, supra,* 11 Cal.4th at p. 831.) A dismissal on due process grounds may be improper if a less drastic alternative is available that still protects the defendant's right to due process. (See *U.S. v. Kearns* (9th Cir. 1993) 5 F.3d 1251, 1254.) Many cases have acknowledged the ability of courts to administer ameliorative jury instructions. (See *Youngblood*, *supra*, 488 U.S. at p. 60 (conc. opn. of Stevens, J.); *People v. Montes*, *supra*, 58 Cal.4th at p. 837.)

There are few cases after *Youngblood*, however, where the bad faith destruction of material exculpatory evidence warranted anything less than dismissal, and dismissal is proper if less drastic alternatives are unavailable. (See *U.S. v. Kearns*, *supra*,

21

5 F.3d at p. 1254.)  For example, the *Cooper* court found that a proposed jury instruction would pale in comparison to the potential value of the destroyed evidence.  (*Cooper*, *supra*, 938 F.2d at p. 932.)  The destruction of the lab equipment itself deprived the defendants the ability to establish their innocence, because experts could not determine by viewing photographs whether or not the lab was constructed for methamphetamine production.  (*Ibid*; see also *U.S. v. Bohl* (10th Cir. 1994) 25 F.3d 904, 914 [bad faith destruction of evidence required dismissal because the effect of destruction and dearth of adequate secondary evidence violated the defendants' due process rights].)

Moreover, it is far from obvious what lesser remedy might come anywhere close to addressing the FPD's bad faith failure to retain material video evidence, and perhaps this is why the prosecution never suggested one.  In any event, we conclude, given the weight of the authority on this point and the People's failure to offer a viable alternative sanction, the trial court did not abuse its discretion by dismissing the case.

The importance of holding the police and the prosecution to their obligations under *Brady*, *Trombetta* and *Youngblood* cannot be overstated.  Police and prosecutors are more than willing to avail themselves of technology when it is to their advantage; there must be a level playing field that gives defendants equal access to the same evidence.  Equal and fair treatment in this respect is nothing less than the foundation upon which due process is built.

Judge Kozinski recently stated:  "There is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to it."  (*U. S. v. Olsen* (9th Cir. 2013) 737 F.3d 625, 626 (Kozinski, J., dis. from denial of rehg. en banc).)  Perhaps the same is true of *Trombetta* and *Youngblood*; what is so disturbing about unretained or destroyed

22

evidence is that we can never truly know what was lost.[5]  While judges must act as "quality control" to remedy constitutional errors, it is ultimately up to the police and prosecutors to end the failure to retain evidence or its bad faith destruction.

### III

### DISPOSITION

The court's order is affirmed as to defendants Cisneros and Alvarez, and reversed as to defendant Renteria.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.

---

[5] This is usually, but not always, true.  The defendant in *Youngblood*, one of the key cases on this issue, provides us with not only the pertinent law, but also a disturbing cautionary note.  Twelve years after the Supreme Court decided the case, the science had sufficiently improved over time to permit testing of the evidence in the case.  The defendant was then exonerated due to the new DNA evidence.  (See Whitaker, *DNA Frees Inmate Years After Justices Rejected Plea* (Aug. 11, 2000) The New York Times, <http://www.nytimes.com/2000/08/11/us/dna-frees-inmate-years-after-justices-rejected-plea.html> (as of Sept. 4, 2014).)