Filed 9/30/20  P. v. Puletasi CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

KALII ELEKANA PULETASI,

    Defendant and Appellant.

E074191

(Super.Ct.No. RIF1603172)

OPINION

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., and Jeffrey Prevost, Judges.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Kalii Elekana Puletasi was convicted of six robberies, one attempted robbery, and assault with a semiautomatic firearm. On appeal, he contends the trial court erred in denying his motion to dismiss based on the apparent destruction of surveillance footage (from the attempted robbery), which he asserts was "likely exculpatory or, at the very least, potentially useful to the defense." He also contends the court erred in excluding third party culpability evidence. We reject these contentions and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A series of robberies at businesses in close proximity to one another occurred in Perris from 2013 to 2015: (1) March 3, 2015, robbery of Walgreens (cash plus drugs with codeine) on Perris Boulevard; (2) May 23, 2013, second robbery of Walgreens (cash plus drugs with codeine) on Perris Boulevard; (3) March 26, 2015, robbery of Perris Metro PCS store by a man wearing a hoodie, baseball cap, sunglasses, and jeans; (4) April 20, 2015, a second robbery of the same Metro PCS store; and (5) April 20, 2015, robbery of the Perris Hills Pharmacy, located adjacent to the Metro PCS store. However, the identity of the suspect remained unknown until the attempted robbery of the Perris Buffet restaurant in May 2015. Because the issues raised in this appeal concern the Perris Buffet attempted robbery, a more detailed account of that incident is provided.

On May 17, 2015, at approximately 9:00 p.m., Mr. Chen was working at Perris Buffet. There were approximately seven or eight customers and six or seven employees at the restaurant, which was in the process of closing. A man walked into the restaurant, and Chen informed him the business was already closed for the day, at which point the

2

man lifted his clothing to show a gun in his front pants pocket and demanded all the money. Chen described the man as having facial hair, wearing a hat and sunglasses, and carrying a semiautomatic handgun.

Chen falsely told the man that the boss took the money and left through the back door. The man asked to be taken to the back door to look for the boss. Chen complied and, as the man walked through the kitchen door, Chen activated the security alarm. The man started running toward Chen to get away from the employees who were hitting him. One employee tried to hit him with a broomstick, and they all chased him outside for about a block, toward an apartment complex. When the man reached the complex, he stopped running, turned around, fired two or three shots at the employees, and then ran away.

Deputy Grant and other deputies responded to a call of an armed robbery at the restaurant. A search produced several blood droplets on the floor, where Chen indicated the employees had attacked the suspect, and on the concrete sidewalk at the main entrance of the building. An analysis of the blood was conducted. When it did not match any of the employees, it was sent to the sheriff's department and the California Department of Justice, and it matched defendant's DNA.[1] The deputies also found shell casings (from a .40-caliber semiautomatic handgun) at a nearby apartment complex.

The deputies obtained a photograph of defendant from the California Department of Motor Vehicles and obtained a series of possible addresses. A subsequent search of

---

[1] Prior to this attempted robbery, there was no physical evidence linking defendant to any robbery.

one address in Long Beach[2] produced (1) sunglasses and several baseball caps, (2) a black .40-caliber semiautomatic Glock handgun, which was located in a black jacket in the closet, and (3) a black gun inside a dishwasher.[3] Later, while deputies were searching a Riverside address, they found defendant hiding in a closet. Deputies did not find any evidence of drugs that had been stolen during the robberies or any evidence that defendant used or was addicted to the stolen drugs.

The deputies created a series of "six packs," photos of various individuals, including defendant, to show witnesses. The six-pack photo lineups were shown to six of the witnesses to the series of robberies. Two Walgreens employees and one Perris Hills Pharmacy employee identified defendant's photo as the suspect. Two other Walgreens employees and the Metro PCS employee were unable to identify anyone as the suspect.

On August 29, 2019, a jury convicted defendant of six counts of robbery (Pen. Code, § 211) and one count of attempted robbery (§§ 664, 211). As to each count, the jury found that defendant had personally used a firearm. (§ 12022.53, subd. (b).) Also, the jury convicted defendant of one count of assault with a semiautomatic firearm (§ 245, subd. (b)), and found that he had personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). On November 1, 2019, the trial court sentenced defendant to state prison for a total term of 30 years.

---

[2] It was later determined that defendant previously lived with his family at the Long Beach address. Also, defendant's father claimed the sunglasses found at the residence belonged to him.

[3] The shell casings did not match either of these guns.

## II.  DISCUSSION

### A.      *Destruction of Surveillance Video.*

Defendant faults the People for failing to preserve the Perris Buffet surveillance video, which he claims would have shown the identity of the suspect and provided "likely exculpatory" evidence.  He charges the People with bad faith and contends his case should have been dismissed pursuant to *California v. Trombetta* (1984) 467 U.S. 479, 488-489 (*Trombetta*).  As we explain, we disagree.

### 1.      *Further background information.*

Prior to trial, the prosecutor alerted the trial court and counsel that there was an issue with the surveillance video of the attempted Perris Buffet robbery, which was the basis for linking defendant with the previous six robberies.  He believed he had turned over the complete surveillance video; however, on the day prior to jury selection, he realized that the version in his possession was a shortened version that did not show the actual attempted robbery.  The prosecutor was unable to locate the original, complete video.

Defense counsel moved to dismiss the charges pursuant to *Trombetta*.  Deputy Grant testified that he was called to the Perris Buffet restaurant to investigate an attempted robbery on May 17, 2015.[4]  At the restaurant, the deputy watched surveillance footage, which captured the suspect walking up to the register, lifting the left side of his shirt, and walking into the dining room.  Shortly thereafter, everyone ran.  The deputy

---

[4]  The Honorable Jeffrey Prevost, Judge, conducted the *Trombetta* hearing.

5

explained that he could see the suspect in the video, including his facial features and his clothing, and the information provided by two witnesses at the scene was consistent with what he had viewed in the video.

Deputy Grant further testified that one week prior, he had received a call from the prosecutor asking for a copy of the surveillance video. The prosecutor asked if there was a copy of the video in the sheriff's property room, and the deputy said no. When the prosecutor asked if the deputy had looked into why it was not in the property room or if he had talked to anyone in the property room, the deputy replied: "Yes. [¶] I was told that someone from the district attorney's office had picked up the CD." The deputy further indicated that was "pretty much the extent of [his] knowledge or experience or contact with that video."

Deputy Martinez testified that he had viewed the video three to five times at the sheriff's station. He also viewed the surveillance footage from the other robberies in this case, and it appeared to him that the suspect was the same individual in all of the robberies. He stated the footage showed the facial features of the suspect; the footage matched the witnesses' statements; the person in the video fit the general description of the suspect from the other robberies; and he believed that all of the robberies were committed by the same person. He last saw the full video several days after the incident, but had not seen it since and had no idea where it went.

Defense counsel then told the court, "they did lose the video," which contained exculpatory evidence because it showed the face of the suspect who had committed the

attempted robbery. He argued that if the jury could see the video, it could decide the identity of the suspect.

In response, the prosecutor pointed out that the deputies who had viewed the video testified that it was consistent with the witnesses' descriptions of the suspect, and the suspect appeared to be the same person in all of the robberies. The prosecutor added that DNA evidence from the Perris Buffet attempted robbery matched defendant. Thus, the prosecutor argued the surveillance video was not even "potentially" exculpatory. He further added: "What happened to the video? Obviously, we don't know. We would like to know. Clearly, somebody lost it or didn't copy it properly. I don't know. . . . Multiple officers involved saw it; multiple people saw it. And according to them all, it's completely in line with the witnesses' statements; . . . . [I]t matches the suspect in the alleged robberies; it matches [defendant]."

The trial court denied defendant's motion to dismiss, finding (1) there was "no bad faith on the part of the People or the handler of the responsible law enforcement agency in the apparent loss of the tape," and (2) the existence of DNA evidence, which shows defendant was "present at the scene," indicates the "tape itself is not something that would be exculpatory or of use to the Defense."

### 2. *Applicable legal principles.*

Due process obligates the state to preserve evidence if it "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta*, *supra*, 467 U.S. at p. 489.) However, "if the

7

best that can be said of the [lost or destroyed] evidence is that it was 'potentially useful,' the defendant must also establish bad faith on the part of the police or prosecution" to show a due process violation. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 773 (*Alvarez*); see *Arizona v. Youngblood* (1988) 488 U.S. 51, 58 (*Youngblood*).)

Bad faith is evaluated based on the state's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (See *Youngblood*, *supra*, 488 U.S. at p. 56, fn. *.) If the police or the prosecutor "'by their conduct indicate that the evidence could form a basis for exonerating the defendant' [citation] and fail to preserve it, that shows bad faith." (*Alvarez*, *supra*, 229 Cal.App.4th at p. 777.) In other words, if the state undertakes "a calculated effort to circumvent the disclosure requirements" and suppress exculpatory evidence, then it acts in bad faith in failing to preserve the evidence. (*Trombetta*, *supra*, 467 U.S. at p. 488.)

"We review the trial court's decision on a *Trombetta*/*Youngblood* motion under the substantial evidence standard. [Citations.] 'In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value' in support of the court's decision. [Citation.] "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"'"'" (*Alvarez*, *supra*, 229 Cal.App.4th at p. 774.)

8

### 3. *Analysis.*

Here, defendant contends that the surveillance video, which showed the facial features of the suspect, "had the potential to either completely exonerate [him] or, at the very least, further muddle the already uncertain identification of the suspects by the witnesses to the respective robberies." However, the deputies who viewed the video testified that it showed the suspect in the Perris Buffet was the same person who had committed the other robberies at issue. Also, defendant's DNA was found in the blood left behind at the Perris Buffet after the employees struck the suspect with a broom stick. Given the deputies' testimony and defendant's DNA at the restaurant, there is substantial evidence to support the trial court's determination that the video did not "possess an exculpatory value that was apparent before [it] was destroyed." (*Trombetta*, *supra*, 467 U.S. at p. 489.)

Nonetheless, defendant argues that "the People's inability to explain the loss or destruction of the video reflects an appalling indifference to their duty to preserve evidence under *Trombetta*," constituting bad faith, not "gross negligence." We disagree. As we previously stated, bad faith is evaluated based on the People's "knowledge of the exculpatory value" of the video. (See *Youngblood*, *supra*, 488 U.S. at p. 56, fn. *.) Here, there was none. Because of the video, deputies were able to identify the individual who had attempted to rob the restaurant and connect him to several other robberies in the vicinity. Since the video was inculpatory, the trial court correctly concluded that its loss was the result of gross negligence, not bad faith. (*Alvarez*, *supra*, 229 Cal.App.4th at p. 777.)

9

Because substantial evidence supports the trial court's determination that the People or its representatives did not act in bad faith, and that the lost evidence did not have apparent exculpatory value, defendant has not shown a violation of his due process rights under *Trombetta* or *Youngblood*. Thus, the trial court did not err in denying defendant's motion to dismiss.

### B. *Exclusion of Third Party Culpability Evidence.*

Defendant contends the trial court abused its discretion in excluding evidence regarding the culpability of another party: Mr. Tuli. We disagree.

#### 1. *Further background information.*

Prior to trial, the prosecution moved to exclude third party culpability evidence regarding Mr. Tuli. The motion noted that Tuli had been charged with committing seven robberies between July 12 and 21, 2016, entered guilty pleas to five counts, and was sentenced to prison. The prosecutor asserted there was "no direct or circumstantial evidence linking Tuli to any of the charged crimes in this case." He added, the only similarities are that Tuli and defendant are the same race, and the crimes were committed in the same time frame. While Tuli's crimes were committed over the course of two weeks, defendant's occurred over the course of three years. Tuli confessed to his crimes, asserting that he had lost his job and needed money; he was silent as to the robberies in defendant's case. All "but one of [Tuli's] robberies occurred at a bank located within a grocery store"; the one occurred in a Domino's Pizza parking lot. While Tuli used a "BB gun," defendant used a semiautomatic handgun. While Tuli's robberies spanned three cities in two counties, defendant's occurred "within a few mile radius." Thus, the

10

prosecutor argued that any evidence regarding Tuli was irrelevant.  Citing *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), the trial court found the motion was "too premature at this stage" and took it under submission.

Near the close of the People's case, the trial court found there was "evidence that someone else could have committed some of the robberies," because of testimony that "some of the witnesses" were unable to identify the suspect from a photo lineup.  The prosecutor clarified that he was seeking to prevent the defense from introducing evidence of a specific individual, Tuli, not to prohibit defendant from arguing, in general, that he was not the suspect.  The prosecutor pointed out that (1) Tuli did not match the physical description of the other person in the photo lineup that some witnesses thought might have been the perpetrator, and (2) there was no other evidence tying Tuli to the charged offenses.  Defense counsel responded by pointing out that Tuli had pled guilty to various robberies (including a convenience store & a pharmacy) committed around the same time frame, and he wore a cap and sunglasses during their commission.  However, counsel conceded there was nothing unique about the cap that made it similar to the witnesses' descriptions of the cap used by the perpetrator in the charged offenses.

The trial court modified its ruling and concluded there was no substantial evidence tying Tuli to the charged offenses.  Thus, while defense counsel was permitted to argue third party culpability, he could not argue that Tuli had committed the charged offenses.

During cross-examination of Deputy Martinez, defense counsel attempted to ask, "Now, during the time that these robberies are going on, there [were] other robberies going on that somebody with a similar description of [defendant] was committing, right?"

11

The prosecutor objected on the grounds of relevance and Evidence Code section 402. The court sustained the objection on vagueness grounds and provided defense counsel the opportunity to rephrase the question. After several more attempts, sustained objections, and a discussion outside the presence of the jury, defense counsel asked, "Were there similar robberies of pharmacies and cell phone companies in the Perris Boulevard/Nuevo Road area of Perris [in June 2016]?" The deputy responded, "That I recall, no." Defense counsel then asked whether there had been similar robberies of pharmacies and cell phone stores, in that same area, which "matched the same description of the suspect," within the six months after June 2016. Again, the deputy responded, "That I am aware of, no, sir."

####    2.    *Applicable legal principles.*

"[C]ourts should . . . treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Hall*, *supra*, 41 Cal.3d at p. 834.) To be relevant and admissible, however, "evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325.) "At the same time, we do not require that any evidence, however remote,

12

must be admitted to show a third party's possible culpability." (*Hall*, at p. 833.) Rather, "[u]nder *Hall* and its progeny, third party culpability evidence is relevant and admissible only if it succeeds in 'linking the third person to the actual perpetration of the crime.'" (*People v. DePriest* (2007) 42 Cal.4th 1, 43.) "Without this link, such evidence is irrelevant and cannot be admitted." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 283.) Thus, "[e]vidence that another person had 'motive or opportunity' to commit the charged crime, or had some 'remote' connection to the victim or crime scene, is not sufficient to" establish the required link. (*People v. DePriest*, at p. 43.)

"We review a trial court's ruling on the admissibility of third party culpability evidence for abuse of discretion." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 572.)

### 3. Analysis.

On this record, we conclude the trial court correctly excluded evidence, that Tuli had committed other robberies during the same time frame as the charged offenses, because nothing directly or circumstantially linked Tuli to the charged offenses. (See *Hall*, *supra*, 41 Cal.3d at p. 833.) At best, both Tuli and defendant were the same ethnicity, wore a cap and sunglasses, and had a propensity to commit armed robberies. Otherwise, there were striking differences, as previously noted, between Tuli's crimes and the charged offenses: (1) witnesses identified defendant as the person who had robbed (or attempted to rob) the stores, and (2) DNA evidence from the Perris Buffet attempted robbery matched defendant. The fact that Tuli committed other robberies was insufficient to raise a reasonable doubt as to defendant's guilt. Thus, defendant's proposed evidence of third party culpability failed to satisfy *Hall*'*s* threshold

13

requirements of relevance and admissibility.  Because the evidence failed to satisfy the first prong of the test, there was no need for the court to proceed to the second prong of the Evidence Code section 352 analysis and determine whether the probative value of the nonexistent evidence was substantially outweighed by its potential for prejudice.  (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1325.)

"Having concluded this speculative third party culpability evidence was properly excluded, we also reject defendant's claim that his constitutional rights were violated by the exclusion."  (*People v. Young* (2019) 7 Cal.5th 905, 938.)

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                                        J.

We concur:


RAMIREZ
            P. J.


SLOUGH
            J.

14