Filed 1/22/16  P. v. Garron CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Appellant, | E061504 |
| v. | (Super.Ct.No. RIF1302230) |
| STEVEN DOUGLAS GARRON, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Judge.

Affirmed.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

Michael A. Hestrin, District Attorney, Matt Reilly, and Alan D. Tate, Deputy District Attorneys, for Plaintiff and Appellant.

1

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Defendant and appellant Steven Douglas Garron, Jr., appeals his robbery conviction, and plaintiff and appellant the People appeal the dismissal of a second robbery charge against defendant.

The district attorney charged defendant with two counts of robbery with personal use of a firearm (Pen. Code, §§ 211, 12022.53, subd. (b), 1192.7, subd. (c)(8)),[1] one on April 26, 2013 against a customer at a Bank of America drive-up ATM (count 1), and the other on April 12, 2013 against a Walmart loss protection associate (count 2). After the jury heard evidence regarding count 2, the court dismissed the count based on a finding that the police had destroyed, in bad faith, a surveillance video that could have been helpful to the defense. At the prosecution's request, the court instructed the jury that it could consider the count 2 evidence as circumstantial evidence of defendant's intent to commit count 1.

The jury convicted defendant of count 1 and found true the firearm enhancement. Defendant admitted a prior strike, a prior serious felony, and two prison priors. The court sentenced defendant to a total of 24 years in state prison.

On appeal, the district attorney argues there was insufficient evidence to support a dismissal of count 2 and that the court applied the wrong standard under *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*). Defendant argues the count 2 evidence

_____

[1] All further unspecified statutory references are to the Penal Code.

2

was inadmissible under Evidence Code section 1101, subdivision (b) and was unduly prejudicial under Evidence Code section 352.  We disagree with both challenges and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Defendant's Motion to Dismiss Count 2*

At the preliminary hearing, Jorje Rodriguez, a Walmart loss protection associate, testified that defendant had pulled a gun on him when he tried to stop defendant from shoplifting.  The day before trial, defendant moved to dismiss this count (count 2) under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) arguing the prosecution had failed to preserve a Walmart surveillance video that captured defendant's interaction with Rodriguez.  Defense counsel argued the video was exculpatory evidence because it showed that defendant did not have a gun in his hand.

At the hearing on defendant's motion, the court heard testimony from the deputy at the Riverside County Sheriff's Department who responded to the Walmart incident, viewed the surveillance video, and booked it into evidence.  When the deputy arrived at the scene of the alleged robbery, Rodriguez told him he thought "there was something in [defendant's] hand . . . [s]ome small shiny object, possibly a small-caliber handgun."  When the deputy watched the surveillance video, he was unable to determine whether defendant had a gun.  He explained that it was "difficult to see" what was in defendant's

hand due to the camera angle: "It may be a slight glimmer from the streetlights that might shine from his hand. It's unclear what it could be for certain."

The deputy testified that the officer who books an item into evidence will receive a set of notifications or "ticklers" at various intervals (e.g., 30 days, 60 days), at which point the officer must determine whether to preserve or destroy the evidence. The decision depends on whether the evidence relates to a case that has been filed: "You look it up to see if the evidence does need to be continued, if the case has been picked up, and you need to hold it for trial, or . . . if it's not going anywhere, it was unfounded, you can return the item or destroy it." In this case, he had the video destroyed without checking to see whether a case had been filed. He admitted this was an oversight on his part.

Based on the deputy's testimony, the court stated that "[defendant] has been prejudiced" and that it was "quite concerned about the effect of the destruction upon his case." The court reasoned that without the video the jury would not have the opportunity to determine "whether it's a glint of light off of [defendant's] finger [or] whether it's nothing at all that's in the imagination of the viewer." However, the court refused to dismiss count 2 because, while it found the destruction was "terribly negligent," it did not find it was done in bad faith. As a sanction for failing to preserve the evidence, the court ordered the prosecution to enter into a stipulation stating the Walmart surveillance video "does not show a firearm."

4

B.   *Opening Statement*

During her opening statement, defense counsel argued defendant had been misidentified and was not the perpetrator of the ATM robbery in count 1.  With regard to count 2, she conceded defendant had shoplifted from Walmart, but argued his actions did not amount to robbery because, contrary to the victim's testimony, he did not use a gun.

C.   *Trial Testimony Regarding Count 2*

On April 12, 2013, Rodriguez was working as an asset protection associate at a Walmart in Perris and noticed defendant put clothing in his waistband and exit the store.  Rodriguez followed defendant and called 911 to report the shoplifting.  He described defendant to the dispatcher as a White male wearing a black baseball hat, black sweatshirt, and blue jeans.  The transcript of Rodriguez's dispatch calls, which were played for the jury, captured his confrontation of defendant outside the store.  Immediately after identifying himself to defendant as security, Rodriguez reported to the dispatcher, "[Defendant] may have pulled something out of his hand.  I think he has a gun in his hand.  He's running right now."  He told the dispatcher that defendant "flashed like a gun or something at me."

At trial, Rodriguez testified he was "a hundred percent sure" defendant had pulled a gun on him.  He described the gun as "shiny" and "chrome-colored."  He admitted he was not sure defendant had a gun at the time of the incident.  He explained:  "What I did is I reviewed video, and with the video, I confirmed that he had a gun in his hand.

5

The deputy testified that when he arrived at the scene moments after defendant had fled, Rodriguez told him he thought defendant had a gun. However, Rodriguez "couldn't identify it as a gun [because] he didn't see the whole thing." When the deputy reviewed the surveillance video, he was able to see something "shiny" and "small" in defendant's hand, which "could have been any number of things that could reflect light," such as a cell phone or keys. After viewing the video, he labeled the case as a petty theft on the evidence tag. He later destroyed the video without checking to see if a case had been filed because he figured it was a "go-nowhere" case.

D. *Dismissal of Count 2*

Following Rodriguez's and the deputy's testimony, the prosecutor told the court she was concerned she would violate an ethical duty if she entered into the proposed Walmart surveillance video stipulation. She argued that, because Rodriguez had testified the video did show a gun, a stipulation stating the video "does not show a firearm" was "not truthful" and did not "comport with the evidence."

The court responded that the deputy's trial testimony revealed a fact that had not come to light during the hearing on defendant's *Trombetta* motion, namely, that the deputy had "booked the CD of the videotape under a [section] 488 [petty theft] as opposed to a robbery." The court reasoned: "That, by itself, indicates one of two things to me. One, that it's either a simple act of negligence, which cascaded into the later events of the destruction of the tape, or it indicates that upon his viewing of the tape when he did not observe a firearm that he concluded that, at best, the offense was a petty theft,

6

[section] 488, as opposed to a robbery. [¶] Either way, it contributed to his later determination that the case was of no merit or of no moment."

Based on this new testimony, the court found the video had been destroyed in bad faith, and it dismissed count 2. The court stated: "I conclude that the conduct of [the deputy] does rise to the level of gross negligence, and my view is that equates to malice, and for that reason, I do find the destruction of the tape to have been in bad faith. [¶] We've attempted to accomplish, 'by a scalpel,' a stipulation or other remedy that would afford due process to both parties. I find that [defendant] has been deprived of due process in this matter."

E.      *Count 1 (the ATM Robbery)*

Following the dismissal of count 2, the prosecution presented its count 1 evidence. At 4:10 a.m. on April 26, 2013, Francisco Edeza was robbed at gunpoint at the Bank of America drive-up ATM in Perris. Edeza had just withdrawn money from the ATM when a man appeared next to his driver side window, pointed a gun about five inches from his face, and demanded his money. Edeza complied and the man ran away. The interaction lasted about six seconds.

Edeza immediately called 911 to report the robbery; his 911 call was played for the jury. He described the perpetrator as a White male, 25 to 35 years old, about five feet seven inches tall and 180 pounds, wearing a black baseball hat, a black sweatshirt, and blue pants. He described the gun as a small, chrome .357.

7

Less than a week later, Edeza met with Deputy Sheriff Josh Patterson to view a photographic lineup. After only three seconds of looking at the lineup, Edeza was sure that defendant was the man who robbed him. Edeza testified that he had a clear, unobstructed view of the perpetrator's face during the robbery. The area around the ATM was well lit and Edeza was able to focus on his face—from his chin to his eyebrows—for about six seconds. He had noticed that the perpetrator's eyes were a brownish green. He testified that the man in the photograph had the same eyebrow shape, complexion, and facial structure as the perpetrator.

While defendant has tattoos on his knuckles and covering his neck, Edeza could not say whether the perpetrator had any tattoos because the perpetrator was wearing a "black thick sweatshirt covering his neck." Edeza did not pay attention to the perpetrator's knuckles because Edeza was focusing on his face and his gun.

The prosecution played the ATM surveillance video for the jury.[2] The video shows the perpetrator waiting in the parking lot, then walking up to Edeza's car and robbing him. The camera captures the perpetrator from behind as he robs Edeza. From this angle, there are visible tattoos on the back left side of the perpetrator's neck.

Deputy Patterson testified he reviewed the ATM surveillance video and had determined the perpetrator closely resembled defendant. He based his opinion on his observation that both the perpetrator and defendant had neck tattoos and "very distinct wrinkle lines and frown lines" near the nose and mouth.

---

[2] We ordered the exhibits in this case and reviewed the ATM surveillance video.

8

F.      *Defense Case*

Professor of Psychology Dr. Kathy Pezdek testified as an expert on eyewitness memory and identification. She opined that several factors reduced the reliability of Edeza's identification of defendant, including stress, a short exposure time to the perpetrator's face, the perpetrator's use of a weapon, cross-racial identification (Edeza is Latino and defendant is Caucasian), and the failure to use a double-blind procedure for the photographic lineup.

G.      *The Use of the Count 2 Evidence as Circumstantial Evidence of Intent*

At the close of evidence, the prosecutor requested permission to argue the count 2 evidence was circumstantial evidence of defendant's intent to deprive Edeza of his property. She argued the Walmart incident was sufficiently similar to the ATM robbery to be relevant to defendant's intent during the ATM robbery. Defense counsel objected, stating that the only material issue in the case was identity, and that intent was not at issue because the testimony established the perpetrator pointed a gun to Edeza's head and demanded his money. She argued that the Walmart and ATM incidents were too dissimilar to satisfy the similarity test for intent, let alone the more rigorous similarity test for identity.

The court concluded defendant's not guilty plea placed intent in issue. The court ruled the Walmart incident was not sufficiently similar to the ATM robbery to be used as evidence of identity. However, it found the incidents were sufficiently similar for purposes of intent, given that both were carried out "in the small town of Perris, close in

9

time to each other." The court also observed that defendant wore similar types of clothes and used a gun in both incidents. Next, the court found the evidence was not unduly prejudicial under Evidence Code section 352, stating: "The evidence is sufficiently probative, I think, to overcome the inherent prejudicial nature of the use of the uncharged offense. The jury has heard the evidence already. Although they would be charged with not having to consider the evidence for purposes of determining a verdict in the case, I think that they would, if it were still charged, consider the evidence in total with respect to . . . the perpetrator's intent in both instances. . . . And I think it's appropriate for the jury to give that consideration with the one count being withdrawn from their consideration at this point."

The court reserved its ruling and granted defense counsel's request to brief the issue. The following day, after reviewing the briefs and hearing further argument, the court maintained its prior findings and ruled the jury could consider the count 2 evidence for the limited purpose of intent.

The court instructed the jury they no longer needed to decide count 2. Using CALCRIM No. 375, it instructed that the count 2 evidence could be considered for the limited purpose of determining defendant's intent regarding count 1, but could not be considered as evidence of bad character or predisposition to commit a crime, or as sufficient by itself to prove guilt.

10

ANALYSIS

A.     *Dismissal of Count 2*

The district attorney argues there was insufficient evidence to support the trial court's dismissal of count 2 based on defendant's *Trombetta/Youngblood* motion.  We disagree.

We review a trial court's ruling on a *Trombetta*/*Youngblood* motion for substantial evidence.  If the circumstances reasonably support the court's ruling, the fact that they might also reasonably support a contrary ruling does not warrant reversal.  (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 774 (*Alvarez*).)

The due process clause of the Fourteenth Amendment requires law enforcement agencies to preserve exculpatory evidence "that might be expected to play a significant role in the suspect's defense." (*Trombetta*, *supra*, 467 U.S. at pp. 488-489; *People v. Beeler* (1995) 9 Cal.4th 953, 976.)  When evidence is only *potentially* useful to the defense, the state's failure to preserve the evidence does not violate due process unless " 'the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant' [citation] and [nevertheless] fail to preserve it." (*Alvarez*, *supra*, 229 Cal.App.4th at p. 777, quoting *Youngblood*, *supra*, 488 U.S. at p. 58 [where defendant asked an officer at the scene of the crime to watch the surveillance video because it would show he did not participate in the robbery, failure to obtain the video constituted a violation of the duty to preserve potentially exculpatory evidence].)  "Thus,

there is a distinction between *Trombetta*'s 'exculpatory value that was apparent' criteria and the standard set forth in *Youngblood* for 'potentially useful' evidence." (*Alvarez*, *supra*, 229 Cal.App.4th at p. 773.)

Contrary to the district attorney's contention, the *Youngblood* standard does not require a finding that law enforcement acted with a "positive intent actually to harm." As the court explained in *Alvarez*, the standard simply requires a finding that law enforcement *recognized* the potentially exculpatory value of the evidence it failed to preserve. (*People v. Beeler*, *supra*, 9 Cal.4th at p. 976 [the duty to preserve " 'necessarily turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed' "].)

Here, even though the court and the parties did not have the opportunity to view the Walmart surveillance video, the evidence was potentially useful to defendant based on the deputy's testimony that he could not tell from the video whether defendant was holding a gun. As the court reasoned, defendant was deprived of letting the jurors determine for themselves whether the video showed a gun. If, like the deputy, the jurors could not determine whether the gleam in defendant's hand was a gun, it is possible they would have found the prosecution had not proven the elements of robbery beyond a reasonable doubt. Thus, the court properly employed the *Youngblood* standard.

The deputy testified that after viewing the video he booked it into evidence under petty theft, and not robbery. He also admitted he had considered the case a "go-nowhere" case. The trial court assessed the deputy's credibility and found that his assessment of

12

the case as a petty theft indicated he recognized the potentially exculpatory value of the video. That the deputy booked the video under petty theft, even though the victim of the alleged robbery told him at the scene of the crime that defendant had probably used a gun, reasonably supports a finding that he saw the video as having exculpatory value. This perception of the video's value, coupled with the failure to preserve the video, constitutes a failure of the duty to preserve potentially exculpatory evidence under *Youngblood*.

We agree with the district attorney that the deputy did not act with malicious intent and the worst that can be said of his destruction of the video is that it constituted a lapse in judgment. However, malicious intent is not required under *Youngblood*. As the reviewing court, we cannot reweigh the evidence and must defer to the trial court on issues of credibility. (E.g., *People v. Lindberg* (2008) 45 Cal.4th 1, 27.) Based on the deputy's testimony, the court could reasonably find that the deputy recognized the potentially exculpatory value of the video before intentionally, though not maliciously, destroying it.

B.   *The Count 2 Intent Instruction*

A trial court's evidentiary rulings are reviewed for abuse of discretion. (*People v. Rogers* (2013) 57 Cal.4th 296, 326.) Under this standard, reversal is not required " ' "unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ibid.*)

13

Defendant argues the court's intent instruction was erroneous because intent was not actually in issue and because count 2 was not sufficiently similar to count 1. Defendant also argues that use of the count 2 evidence for intent was unduly prejudicial because his guilt hinged on Edeza's identification and because there was a high risk that the jury would view the count 2 evidence as evidence of his criminal propensity. While we agree intent was not actually disputed, we conclude the count 2 evidence was nevertheless admissible for intent because defendant's not guilty plea placed intent in issue. We further conclude defendant was not unduly prejudiced by the court's intent instruction because the jury had already heard the evidence and because the court mitigated the risk of prejudice by admonishing the jury not to consider the evidence as character or propensity evidence.

A defendant's not guilty plea places each element of the crime in issue. (*People v. Balcom* (1994) 7 Cal.4th 414, 422.) The "least degree of similarity" between the uncharged and charged crimes is sufficient to support the use of the uncharged crimes as circumstantial evidence of intent under Evidence Code 1101, subdivision (b). (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) The crimes must be similar enough "to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ibid.*) Even uncharged crimes that are not "particularly similar" to the charged crime are admissible if they are similar in one "crucial" regard: "[T]he intent to steal from victims whom defendant selected." (*People v. Jones* (2011) 51 Cal.4th 346, 371 (*Jones*).)

14

Here, the Walmart and ATM incidents, while also not particularly similar, share this basic similarity of intent to steal from selected victims. Moreover, in each instance, defendant acted at night, wore a black sweatshirt and a black baseball hat (presumably to obstruct his face and reduce the chances of being identified), and used a gun to scare his victims into letting him run off with their property.

Defendant argues that because intent was not actually in dispute (though technically in issue), the count 2 evidence is inadmissible. We agree intent was beyond dispute in this case; however, that does not make the evidence inadmissible; rather, it makes it cumulative and reduces its probative value. (*Ewoldt*, *supra*, 7 Cal.4th at p. 406; *People v. Balcom*, *supra*, 7 Cal.4th at p. 422 [probative value is diminished when the other crimes evidence is admitted to prove something that, based on the evidence, is "beyond dispute"]; see also *People v. Balcom*, *supra*, 7 Cal.4th at pp. 422-423 [probative value of the uncharged rape was low on the issue of the defendant's intent to commit the charged rape because "the victim's testimony that defendant placed a gun to her head, if believed, constitutes compelling evidence of defendant's intent"].)

In *Jones*, *supra*, 51 Cal.4th 346, where the evidence demonstrated that the perpetrator bound and stabbed to death his robbery victims, our Supreme Court rejected the same argument from the defendant, stating: " '[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense. . . . Defendant's assertion that his defense to the [robbery charge] was bound to focus upon identity, and not intent, would not eliminate

15

the prosecution's burden to establish both intent and identity beyond a reasonable doubt. [Citation.] The trial court properly exercised its discretion to admit this limited evidence for [the] limited purpose [of intent].' " (*Id*. at p. 372.) Similarly here, defendant's trial theory was that he was misidentified as the perpetrator, but defendant's not guilty plea placed all of the elements of the robbery in issue, including intent. Thus, we find that the court's instruction properly allowed the jury to consider the count 2 evidence for intent purposes.

Turning to the prejudicial impact of the count 2 evidence under Evidence Code section 352, defendant argues there was an extremely high risk that the jury "would rely on [his] conceded participation in the Walmart incident to conclude [he] was the perpetrator of the ATM robbery." In effect, defendant cites the risk the jury would reason that if he had no compunction about stealing from Walmart, he also likely committed the ATM robbery.

Criminal propensity is always a risk with other crimes evidence. However, we must presume this risk was mitigated by the court's admonition to the jury to refrain from considering the evidence as an indication of defendant's criminal propensity. (See, e.g., *People v. Lewis* (2001) 25 Cal.4th 610, 637 ["the trial court limited any prejudicial impact of the uncharged crimes evidence by instructing the jury . . . that such evidence could not be considered to prove defendant was a person of bad character or that he had a disposition to commit crime"].) Any risk the jury would improperly consider the count 2 evidence as propensity evidence was further mitigated by defense counsel's closing

16

argument. Counsel admonished the jury not to use the count 2 evidence for anything other than intent. She informed the jurors that count 2 had been dismissed. She argued they could only consider the count 2 evidence if the prosecution had proved defendant committed the offense by a preponderance of the evidence, and only then for the limited purpose of intent. She asserted that intent, however, was not at issue: "Identity is the issue, and you're not to use it for any improper purpose, which the only reason the prosecution would introduce it is in the hopes that you would do so."

We conclude the court's intent instruction did not amount to an abuse of discretion. In doing so, we recognize the difficulty of the issue before the court. Unlike the typical situation where the trial court must determine whether to *admit* other crimes evidence, the count 2 evidence had already been admitted as evidence of a charged crime. That charge was later dismissed. However, the court recognized the reality that, having already heard Rodriguez's testimony, it would be difficult for the jurors to completely disregard it.

The court's choice was to instruct the jury either that it could not consider the count 2 evidence at all, or that it could consider the evidence, but only for a limited purpose. The court had already sanctioned the prosecution for failing to preserve the Walmart surveillance video by dismissing count 2. Prohibiting the use of Rodriguez's testimony as circumstantial evidence of intent (as permitted under Evid. Code, § 1101, subd. (b)) would have restricted the prosecution's ability to prove every element of count 1 beyond a reasonable doubt, effectively extending the count 2 sanction to count 1.

Defendant argues that the prosecution's ability to prove intent was essentially a red herring because the jury's verdict hinged on the issue of identity. However, our Supreme Court has rejected this type of argument, concluding that a defendant's assertion that the issue is "identity, and not intent, does not eliminate the prosecution's burden" to "prove each element of its case." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1223.) Viewing the court's choice from defendant's perspective, we cannot say that a wholesale exclusion would have even succeeded in eliminating prejudice. This is, of course, because the jury had already heard the evidence. The jury had also already heard defense counsel concede in her opening statement that defendant was the perpetrator of the Walmart incident. What defendant disputed about the incident was not his involvement, but his alleged use of a gun.

On the other hand, a limiting instruction like the one the trial court provided allows the prosecution to use the evidence for a proper purpose (i.e., for intent which while not in dispute was nevertheless in issue) while simultaneously admonishing the jury not to consider it for any improper purposes, such as identity or criminal propensity. (*People v. Homick* (2012) 55 Cal.4th 816, 866-867 [challenges to the efficacy of limiting instructions should be rejected as "[t]he crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions"].) Based on the options before the court, we cannot conclude that the intent instruction was unreasonable or "patently absurd." (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)

Defendant contends that where, as here, the challenged evidence was the "centerpiece" of the prosecutor's closing argument, the evidence is unduly prejudicial. We disagree with defendant's assessment of the prosecutor's closing argument. Like defense counsel, the prosecutor focused her argument on identification. The majority of her argument detailed the evidence supporting Edeza's identification, which included Edeza's testimony regarding the perpetrator's appearance, the contents of the ATM surveillance video, and Deputy Patterson's opinion that defendant closely resembled the perpetrator in the video. She made no reference to the Walmart incident during her discussion of identity. She mentioned the Walmart incident only during her brief discussion of intent, telling the jury that "the law allows that when there [are] similar circumstances in a previous occasion that that intent is the same in the charged offense." The prosecutor's reference to the count 2 evidence was brief and in no way inflammatory. She correctly reminded the jurors of the limited use of the evidence. There is no likelihood that the prosecutor's closing argument increased the risk that the jury would consider the evidence as identity or propensity evidence.

In any event, even if we had concluded the court abused its discretion in giving the intent instruction, the error would be harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been

19

reached in the absence of the error"].)[3] The perpetrator stood two to three feet away from Edeza during the robbery. The area around the drive-up ATM was well lit, the perpetrator did not wear a mask or otherwise cover his face, and Edeza was able to get a good look at the perpetrator from his chin to his eyebrows. Deputy Patterson testified that he was also able to identify defendant in the surveillance video, based on the neck tattoos and distinctive facial wrinkles that the perpetrator shared with defendant.

Defendant makes much of the fact that Edeza did not notice any tattoos on the perpetrator, but Edeza provided a sufficient explanation for why this was so. He could not see the perpetrator's neck because it was covered, and he was not paying attention to the perpetrator's knuckles because he was focused on his face and gun. Moreover, as previously noted, the jury viewed the ATM surveillance video, in which the perpetrator's neck tattoos are visible. Despite defendant's contention that Dr. Pezdek's testimony demonstrated that Edeza's identification was not reliable, the jury was free to find Edeza's testimony credible. Furthermore, the robbery was captured on surveillance video and the jurors were able to review that video for themselves and decide whether defendant resembled the perpetrator.

---

[3] Defendant is incorrect that the harmless error standard articulated in *Chapman v. California* (1967) 386 U.S. 18 applies to the court's instruction. This standard applies to evidentiary errors of a federal constitutional magnitude. (*Id.* at p. 24.) Where, as here, the alleged evidentiary error does not violate the defendant's right to a fair trial, courts employ the *Watson* standard. (See, e.g., *People v. Foster* (2010) 50 Cal.4th 1301, 1333 [analyzing the defendant's claim that the trial court's admission of other crimes evidence for purposes of identity was prejudicial error under *Watson*].)

Defendant also argues that the jury's questions demonstrated it was not convinced Edeza had correctly identified defendant. We disagree. During deliberation, the jury asked for and received a readback of Deputy Patterson's testimony regarding his review of the ATM surveillance video, a playback of the ATM surveillance video, and a playback of Edeza's and Rodriguez's 911 calls. Nothing about these requests indicates that the jury was inappropriately considering the Walmart evidence as evidence of identity. Rather, the jury's desire to review the ATM surveillance video and Deputy Patterson's testimony, and listen to Edeza's 911 call indicates that it used count 1 evidence to determine that the perpetrator in the video was defendant. Although the jury did request the still photographs from the Walmart surveillance video, the court refused, informing the jury that the photographs were not evidence in the case. Had the jurors been given access to the Walmart photographs, they perhaps would have compared defendant's appearance in those photographs with the perpetrator's appearance in the ATM surveillance video. But the jurors were never given this opportunity.

In sum, the prosecution presented strong evidence that Edeza correctly identified defendant and we see no indication in the record that the jury relied on anything other than count 1 evidence in reaching its decision that defendant was the perpetrator of the ATM robbery. It is therefore not reasonably probable that defendant would have received a more favorable result if the court had not given the intent instruction.

21

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

McKINSTER
J.

22