Filed 1/27/26  P. v. Sanny CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D083398 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD294529) |
| BRYAN L. SANNY, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

David R. Greifinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.


In 2023, a jury convicted Bryan L. Sanny of transportation of a controlled substance for sale (Health & Saf. Code, § 11379; count 5), assault

with a firearm (Pen. Code,[1] §§ 245, subd. (a) & 12022.5, subd. (a); count 2), possession of a controlled substance while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count 3), and misdemeanor resisting arrest (§ 148; count 4).[2] The jury acquitted Sanny of attempted murder and the lesser included offense of voluntary manslaughter (count 1), as well as the greater offense of resisting arrest under section 69 (count 4). The convictions stemmed from two separate incidents. Count 5, not at issue on appeal, occurred in September 2021 when Sanny was pulled over for a traffic violation and police discovered a large quantity of methamphetamine and a digital scale in his possession.

The second, more serious incident (charged in counts 1, 2, 3, and 4) occurred several months later, on May 3, 2022. That night, around 10:00 p.m., Sanny drove to an apartment near Balboa Park to pick up his on-and-off girlfriend, S.G. When he arrived, M.H., a man in Sanny's circle of methamphetamine users, approached Sanny outside his car holding a machete. Minutes later, S.F., another member of the drug circle, charged at Sanny with a taser. Sanny and S.F. then engaged in a physical fight, which ended when Sanny shot S.F. Sanny fled the scene on foot and was apprehended by police as he was hiding in the brush on a hill in Balboa Park. Sanny was arrested, jailed, and charged with the attempted murder of S.F., along with the other crimes.

Later in May, S.G., facing separate criminal charges, told her counsel she had information about the attempted murder of S.F. S.G.'s counsel

---

[1] Subsequent undesignated statutory references are to the Penal Code.

[2] The jury also found true allegations that Sanny personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) with respect to count 2.

arranged a meeting with the prosecutor in Sanny's case. The interview took place on June 14, 2022, and was audio-recorded. During that conversation, S.G. told the prosecutor she had spoken with S.F., who was staying at the apartment where S.G. lived. S.G. stated that S.F. told her that he and M.H. were planning to rob Sanny the night of the shooting, S.F. had tased Sanny in the face before the shooting, and S.F. wanted S.G. to tell Sanny's father he would testify the shooting was accidental in exchange for $50,000 and a truck. S.G. also told the prosecutor her conversations with S.F. had been recorded by security cameras that were installed in the apartment.

Over a year later, on June 28, 2023, the date set for Sanny's trial to begin, the prosecutor disclosed to defense counsel for the first time the existence of her recorded conversation with S.G. After listening to the recording, Sanny's counsel filed a motion to dismiss the case based on the prosecutor's failure to disclose the information S.G. provided in the interview. Defense counsel argued that because the interview contained both exculpatory information and resulted in the destruction of exculpatory evidence (the security video), the prosecution had violated Sanny's right to a fair trial. The trial court delayed trial and conducted an evidentiary hearing on Sanny's motion. Thereafter, the court issued an extensive written order denying Sanny's motion without prejudice to a renewed motion at the conclusion of the trial. The court also stated it would advise the jury of the prosecution's failure to disclose the evidence and play all or some of the recording of the interview at trial at the defense's request.

The case proceeded to trial, and a portion of the prosecutor's recorded interview with S.G. was played for the jury. The court also gave the jury an instruction that the prosecution had improperly withheld from the defense the interview recording, and that the video of S.F.'s statements to S.G.

3

referenced in the interview had been destroyed by the time the interview was disclosed to the defense. After the jury rendered its verdict acquitting Sanny of attempted murder and convicting him of assault with a deadly weapon, Sanny renewed his motion to dismiss. The court denied the motion, finding that although the prosecutor had violated her ethical duties by failing to preserve, in bad faith, evidence that was potentially helpful to the defense, dismissal was not the appropriate remedy because Sanny had received a fair trial. Thereafter, the court sentenced Sanny to nine years in prison.

On appeal from the judgment of conviction, Sanny argues the trial court erred by denying his motion to dismiss because the prosecutor's misconduct violated his due process rights. Sanny also asserts the trial court erred by imposing a concurrent term for possession of a controlled substance while armed with a firearm, count 3, rather than staying the punishment for this conviction under section 654. The Attorney General responds that the trial court properly denied Sanny's motion to dismiss and that the court properly imposed a separate punishment for count 3.

As we shall explain, we agree with the trial court's finding that the prosecutor, Philippa Cunningham, acted in bad faith by failing to preserve the video evidence disclosed to her by S.G. on June 14, 2022. However, we conclude the trial court did not abuse its discretion by denying Sanny's motion to dismiss because he received a fair trial despite the prosecutor's misconduct. We also reject Sanny's contention the trial court erred by imposing a concurrent term for count 3. Accordingly, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

On May 6, 2022, the People filed an initial complaint against Sanny charging him with the attempted murder of S.F. (§§ 187, subd. (a) & 664),

4

two counts of assault with a firearm against S.F. and M.H. (§ 245, subd. (a)(2)), possession of a firearm while in possession of a controlled substance (Health & Saf. Code, § 11370.1, subd.(a)), and possession of a controlled substance for sale (*id.*, § 11378). Thereafter, on October 20, 2022, the People filed an amended complaint adding a charge for resisting arrest after the shooting (§ 69), and a new charge of transporting a controlled substance for sale arising from Sanny's traffic stop in 2021 (Health & Saf. Code, § 11379, subd. (a)).

On June 28, 2023, the People filed their final amended information, charging Sanny with attempted murder of S.F. while personally discharging a firearm causing great body injury (§§ 187, subd. (a), 664; count 1), assault of S.F. with a firearm (§ 245, subd. (a)(2); count 2), possession of a firearm while in possession of a controlled substance (Health & Saf. Code, § 11370.1, subd. (a); count 3), resisting arrest (§ 69; count 4), and transporting a controlled substance for sale arising from Sanny's traffic stop in 2021 (Health & Saf. Code, § 11379, subd. (a); count 5).

A. *Motion to Dismiss*

The day before trial was set to begin, during discussions on the parties' in-limine motions, Cunningham—for the first time—disclosed to Sanny's defense counsel, Jordan Furrow, and the court that she had a "free-talk" interview with S.G. in June 2022.[3] The following day, Cunningham explained to the court that S.G.'s attorney and a police officer were present during the interview, and it was audio recorded. That day, Furrow listened to the audio recording of the "free-talk" interview, which was about 30 minutes long.

---

[3] An investigator for the prosecution explained at a subsequent evidentiary hearing that the purpose of the "free-talk" interview was for S.G. to offer information potentially in exchange for a deal in her prosecution.

The court then delayed the start of trial to allow the defense to make a motion concerning the newly disclosed interview. On July 3, 2023, Furrow filed a motion to dismiss for a denial of due process. The motion argued Cunningham's delayed disclosure of her recorded interview with S.G. violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) because the interview contained exculpatory evidence. Defense counsel also asserted that it was reasonably probable the outcome of the preliminary hearing would have been more favorable to Sanny if the interview had been disclosed in a timely manner. Further, he asserted the nondisclosure hampered the defense's investigation and development of trial strategy. Defense counsel also argued dismissal of the case was the appropriate remedy for the prosecution's misconduct.

On the same day, the prosecutor filed "Points and Authorities Re: Defense's Anticipated Motion." Therein, Cunningham asserted dismissal of the case was not available because section 1054.5, subdivision (c) allowed the court to dismiss the charges only if it was "required to do so by the Constitution of the United States" and no constitutional violation had occurred. The brief also argued the evidence had not been suppressed because it was disclosed before trial and because statements from an interview of S.G. conducted by a defense investigator revealed that the defense had knowledge of the alleged recordings of S.G.'s conversation with S.F. since September 29, 2022.

When the parties returned to court on July 3, 2023, the court stated its intention to set an evidentiary hearing if Sanny was willing to waive his speedy trial rights. The court noted that because of the serious nature of the charges, and because it appeared there had been a *Brady* violation and a failure by the People to retain potentially exculpatory evidence that had since

been destroyed, the court wanted to provide Cunningham "the opportunity for further explanation." Sanny agreed to waive time, and the court provided the parties with its understanding of the issue and the statements S.G. made during the interview. The court then posed several questions to be addressed during the evidentiary hearing, including whether Cunningham informed the detective in the case about S.G.'s statements, whether the detective also interviewed S.G., whether the prosecution took any steps to obtain the video recordings of the conversations S.G. had with S.F. that were referenced several times in the interview, whether S.G.'s counsel saw the video or ever had possession of it, and what efforts the prosecution made to secure S.F.'s testimony for trial.

At the outset of the two-day evidentiary hearing, the trial court admitted the audio recording of Cunningham's interview with S.G. into evidence, as well as a "partial transcript" of the recording. The prosecutor appointed to handle the hearing, not Cunningham, then stated he did not intend to call any witnesses because the defense had the burden under

section 1054.1 to establish a constitutional error.[4]  The court responded that "the problem is more in the [*California v.*] *Trombetta* [(1984) 467 U.S. 479 (*Trombetta*)] and [*Arizona v.*] *Youngblood* [(1988) 488 U.S. 51 (*Youngblood*)] arena."  The prosecutor argued *Trombetta* and *Youngblood* were not violated because the prosecution was never *in possession* of the video recording that S.G. said existed (and tried to show Cunningham) during the interview.  The prosecutor asserted there was "no corresponding duty on law enforcement to gather physical evidence that might prove useful to the defense."  The prosecutor also doubted the video's existence, arguing "the only evidence that this video ever existed came from [S.G.], the individual with dubious credibility."

In addition, the prosecutor explained that a District Attorney Investigator, Yanci Blackwell, contacted the security system company that S.G. referenced in the interview, Wyze, and was told that any recording would have been saved for only 14 days, which had passed.  The prosecutor also stated that Blackwell did not have the identifying information required by Wyze to obtain the video by warrant.  Cunningham stated that during the

---

[4]    Section 1054.1 states: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies:  [¶] (a) The names and addresses of persons the prosecutor intends to call as witnesses at trial. [¶] (b) Statements of all defendants. [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged. [¶] (d) The existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial. [¶] (e) Any exculpatory evidence. [¶] (f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

interview, she believed that she made it clear to S.G.'s counsel that if he had a copy of the video, she wanted him to provide it to her.

After this initial argument by the prosecution, the court heard testimony from S.G.'s counsel, Blackwell, and S.G. S.G.'s counsel, Greg Turner, testified that S.G. never sent him the video of her conversation with S.F. Rather, she sent Turner an email on May 24, 2022, stating that she had spoken with S.F. for over an hour, and that the conversation had been recorded by cameras in her apartment. The email also said that although they discussed staying out of Sanny's case, S.G. could not "live with myself if I didn't try to help, knowing what I know." Turner testified that when he met with S.G., she showed him seconds-long snippets of video on her phone. Turner told the court that during the interview with Cunningham there was a back-and-forth discussion that the video could be *Brady* evidence. He also stated that after the interview with Cunningham, he was left with the impression that she was going to pursue the video through her resources, and that Turner would not be directly participating in any effort to obtain it.

Cunningham conducted the direct examination of Blackwell. He testified that Cunningham reached out to him on June 15, 2022, the day after she interviewed S.G., and provided him with a copy of the audio recording of the interview. Cunningham asked Blackwell to review the recording and to attempt to obtain the surveillance videos S.G. referenced in the interview. Within a few days, he sent an email to the legal department at Wyze. Blackwell received a response that the company did not retain any information beyond 14 days, but by that time it had been over 14 days since

9

the alleged conversation between S.G. and S.F.[5]  During cross-examination, Blackwell estimated that around June 28, 2022 he concluded a warrant to Wyze would not be fruitful and communicated this to Cunningham the same day.

S.G. testified that she spoke with S.F. in May and S.F. told her that he and M.H. had attacked Sanny, M.H. held a machete to Sanny's neck, S.F. had tased Sanny in the face, and S.F. thought Sanny shot him accidently.  She stated S.F. acted as if the incident were a joke and told her it was funny that Sanny could spend the rest of his life in prison because of the shooting.  She also said S.F. asked her to go to Sanny's dad and tell him that for $50,000 and a truck he would help Sanny with his case.  S.G. said that during this conversation she emailed Turner.  S.G. said she asked A.P., the man she was staying with—who was also her ex-boyfriend and the owner of the security cameras—if she could download the video of her conversation with S.F.  He agreed and they watched the video.  She also said the videos were no longer accessible because they were erased after six months.  S.G. said that during her interview with Cunningham, Cunningham stopped her from providing any details about the conversation with S.F.  S.G. then gave Cunningham

---

[5]     Blackwell provided some specific information about Wyze's service, explaining Wyze does not collect the video that its customers record with their equipment.  Rather, the cameras relay an encrypted signal to the customers' cell phones or other devices.  The company does "save a still photograph once every five minutes, or a 12-second video once every five minutes depending on what plan is purchased" and that information is retained for 14 days.  Blackwell also testified that each "camera is equipped with an SD card slot that can be loaded by the user ... and depending on the amount of activity on that camera, that card will then hold up to" its capacity and then the user can download directly from the card.  Thus, only the user could retain video from the Wyze cameras.

information about the Wyze video that she assumed Cunningham would use to subpoena the company.

At the conclusion of the evidentiary hearing, the court orally pronounced its order denying the motion to dismiss without prejudice.[6]  The court's extensive order set forth a detailed factual and procedural background of the case and the evidence it received at the hearing, including the recording and transcript of Cunningham's interview with S.G.  Because of its importance, the court also explained the contents of the interview in detail.  The court stated that at the start of the recording, S.G. said she "had a conversation with [S.F.] and he told [her] everything, told [her] literally everything" about the night of the shooting.  Cunningham then responded by asking S.G. to "take [her] a couple steps back" so Cunningham could determine "if there's anything exculpatory for [Sanny] in this case in terms of what [S.F.] has said."

S.G. then explained that after S.F. was released from the hospital, he and his girlfriend came to stay at the apartment where S.G. was living with A.P.  S.G. stated that the next morning, S.F. "just started talking to [her] about" the shooting and that S.F. asked her to help him extort Sanny's father for $50,000 and a truck in exchange for S.F.'s help to avoid a criminal conviction  S.G. then told Cunningham she refused this request.  Cunningham specifically asked S.G. if the conversation was "recorded in any way," and S.G. responded that the apartment had security cameras, through Wyze, which she could access on her phone.

Cunningham then cautioned S.G. that if she provided information about Sanny's case, Cunningham was required to give that information to Sanny.  S.G. responded that she understood and that she could not live with

---

6      The court filed a written version of the order on July 21, 2023.

11

herself if she did not come forward with S.F.'s admissions.  After Cunningham again cautioned S.G. about giving contradictory statements, S.G. said she was confident that she remembered the conversation with S.F., and that it was "burned into [her] memory."  S.G. again tried to show Cunningham the video on her phone, but Cunningham refused, telling S.G. to consult with her lawyer and that they could set up a later meeting about the video with an investigator.

S.G. then told Cunningham that she had another conversation with S.F. that morning about the shooting, which would also have been recorded by the security cameras in her apartment.  Cunningham responded by stating that she wanted to talk about S.G.'s conversations with S.F. at a later time.  Cunningham then continued, " 'And that way you can just go look into whether the recording still exists.  You can listen to him, you can talk to Mr. Turner about what that means.' "  Turner then asked Cunningham if S.G. was able to obtain videos of the conversations, if she wanted Turner to transmit the videos.  Cunningham did not provide an answer, stating instead that Turner's "ethical duties are slightly different than mine."  Cunningham stated explicitly that "it does sound like it's gonna end up being *Brady* evidence that I'm going to need to get and turn over" and that if it still existed she would have the opportunity to get it from Wyze without Turner's involvement.  Cunningham also stated that if Turner did obtain the video, they could discuss how to transfer the evidence.

The court also noted that Cunningham declined to testify at the evidentiary hearing and that "[n]o evidence was introduced regarding any effort by the District Attorney's office or the San Diego Police Department to retrieve the video directly from S.G." or to "take [S.G.]'s statement about what [S.F.] had told her."

12

After setting forth this background, the court addressed two separate issues, (1) "Cunningham's failure to disclose [S.G.]'s statements" to Sanny's counsel, and (2) the "prosecution team's failure to secure and preserve the video [S.G.] referred to in her June 2022 interview." With respect to the first issue, the court found the prosecution was in possession of exculpatory information, specifically S.G.'s statements that S.F. and M.H. had attacked Sanny before the shooting and that S.F. wanted to extort Sanny and his family in exchange for either favorable testimony or not testifying. Further, Cunningham explicitly recognized the statements as exculpatory during the interview. The trial court found that Cunningham's failure to turn over S.G.'s statements "was a violation of Penal Code section 1054.1 and Rule of Professional Conduct 3.8."

The court explained, "the prosecution team's response to a witness who was eager to provide exculpatory information was to metaphorically put its fingers in its ears, and pretend the conversation never took place. This decision is deeply disappointing, violative of Penal Code 1054.1, and unethical." The court, however, concluded that because the procedural posture of the case was pre-trial, and the defense was in possession of the statements and they were available for trial, there was not a violation of *Brady*. The court also ruled that because section 1054.1 was violated it would "advise the jury of [the] failure or refusal to disclose evidence" and it would "consider playing all or some of [S.G.]'s recorded statement[s] to the jury if so requested by the defense."

With respect to the second issue, the court found that the surveillance videos discussed by S.G. were potentially useful to the defense and that the prosecution had acted in bad faith as defined by *Youngblood* and its progeny. However, noting that trial courts have a "large measure of discretion in

13

determining the appropriate sanction for failure to preserve material evidence," the court found dismissal was not warranted at that juncture because whether Sanny could "receive a fair trial in the absence of the video [was] unknown." Instead, the court denied the motion without prejudice to a renewed motion after the close of evidence. The court explained that it was "unknown whether and how [S.G. and S.F. would] testify," and, as "observed by the court, all the potential civilian witnesses in this case have credibility problems." The court repeated its ruling that it would "allow the defense to submit a modification of CALCRIM No. 306 [Untimely Disclosure of Evidence] for consideration and [would] consider playing all or some of [S.G.]'s interview if requested by defense."

B. *Prosecution Case*

After the denial of the motion to dismiss, the case proceeded to trial. The prosecution's evidence showed that shortly before 10:00 p.m. on May 3, 2022, M.H. and his girlfriend were parked on 7th Avenue, next to Balboa Park, in San Diego. M.H. testified he was high on methamphetamine and went to that location to pick up S.F., a close friend at the time, and S.F.'s girlfriend from A.P.'s apartment.[7] A.P. was selling drugs and M.H. planned to give S.F. and his girlfriend a ride in exchange for some of the meth purchased from A.P.

After about 15 minutes of waiting, a car M.H. did not recognize drove towards M.H.'s truck. The car then drove past M.H.'s vehicle and parked closely behind him. The car made M.H. nervous, so he called S.F. for help. M.H. then grabbed a machete he kept between his seats and got out of his truck. M.H. testified he then approached the car saying something like, "who the fuck are you?" M.H. also said he raised the machete to shoulder level

---

[7] M.H. testified that at the time of trial he had been sober for over a year.

14

with his left hand.  The driver of the car, Sanny, got out, told M.H. to get back because he was "strapped," and lifted his shirt to show M.H. the handle of a gun.  At that point, M.H. realized it was Sanny and lowered the machete.  Sanny then lowered his shirt.  M.H. and Sanny knew each other as fellow methamphetamine users.

Sanny was at the location to pick up S.G. from A.P.'s apartment.  According to M.H., Sanny asked him why he was there, who was with him, and whether he was there to see S.G.  M.H. said that Sanny seemed angry and agitated.  M.H. was surprised to see Sanny, and thought he might have been drunk because he was acting out of character.  M.H. told Sanny he was there with his girlfriend, but he did not mention that S.F. was at the apartment with S.G.  M.H. then told Sanny he was waiting to meet S.F.[8]

M.H. testified Sanny then became more upset, saying "fuck [S.F.].  Where is he at?  That's who I'm trying to talk to."  Sanny also said S.F. owed him money.  Moments later, S.F. came down from the apartment and made a "clacking" sound with a stun gun in his hand.  M.H. testified that when Sanny saw S.F., Sanny ran towards him.  M.H. testified both men were threatening each other, but S.F. told Sanny he was not there with S.G. and would get Sanny his money.  Sanny threatened S.F. that he would "blast" him.  Sanny and S.F. then engaged in a physical fight; S.F. punched Sanny with one hand and used the other to hit Sanny with the stun gun.  Sanny punched with his left, while he tried to hold the gun in his waistband with his right.

M.H. paced near the fight and saw S.F. start to get the better of Sanny.  Sanny then pointed his gun towards S.F.'s leg in what M.H. described as an attempt to scare S.F.  In response, S.F. lunged with the stun gun and M.H.,

---

8    M.H. denied that he and S.F. had planned to rob Sanny that night.

who was behind Sanny and still holding the machete, heard one gunshot. M.H. could not tell if the gun was discharged accidentally, and did not hear a second gunshot. S.F. fell to the ground screaming he was shot. Sanny then ran past M.H. to the driver's side of his car, reached into it, then ran towards Balboa Park.

M.H. put his machete back into his truck, called 911, and tried to apply pressure to S.F.'s wound while they waited for the police and paramedics to arrive. S.F. was transported to the hospital. At the hospital, doctors performed emergency surgery on S.F. for a bullet track that ran from his lower left flank to his right buttock, which caused bleeding from the femoral vein between the pelvis and abdomen. S.F. had a second wound to his upper right chest that the treating surgeon described as a "superficial," "in-and-out" gunshot wound.

After police arrived, they interviewed M.H. and discovered he was wanted for a felony warrant. M.H. was arrested at the scene and while he was in custody he wrote down Sanny's name as the shooter. He did not want to say Sanny's name out loud because "it's not what we do." Following a pursuit by a police helicopter, a K9 unit, and a search team, Sanny was captured by police in thick brush on a steep hill in Balboa Park. After Sanny failed to respond to repeated police commands to come out of the brush for approximately 30 minutes, police unleashed a K9 on Sanny. Officers then descended on Sanny who surrendered, but only after initially resisting the arrest. Sanny also resisted being handcuffed when he was taken to the hospital to treat his K9 bite wounds.

After arresting Sanny, officers located a backpack Sanny had discarded in Balboa Park and discovered four bags of a crystalline substance that was later determined to be over 100 grams of methamphetamine. Officers

16

searched extensively for the gun Sanny used, but it was never found. Police did recover a nine-millimeter bullet fragment and a live round consistent with that slug on 7th Avenue near where the shooting occurred. Officers also found a stun gun in the patio of a nearby home. Sanny also had gunshot residue on his hands after he was taken into custody.

At the hospital, S.F. was placed into a medically induced coma for two days. After he regained consciousness, on May 9, 2022, the lead detective on the case attempted to talk with S.F. at the hospital. S.F., however, was uncooperative and refused to speak to the detective. The detective testified that S.F. said, "I will not speak to police officers" and told the detective to get out of his room.

The prosecution called S.G. to the stand in its case in chief. S.G. testified she believed S.F. owed Sanny money for drugs that Sanny had provided to him. While S.F. was in the hospital, S.G. left San Diego to attend her stepfather's funeral in Temecula. When she returned to A.P.'s apartment, S.F. and his girlfriend were staying in a spare bedroom there. During this time, S.F. spoke to both S.G. and A.P. about the shooting. S.G. said she was using methamphetamine at that time, but was not impaired because she had a high tolerance as a habitual user. S.G. testified that S.F. told them that M.H. had put a machete to Sanny's neck and pulled him out of his car, and that S.F. had "tased" Sanny in the face with the thought that they could rob him. According to S.G., S.F. and M.H. thought it was funny how Sanny screamed when he was tased. S.F. also told S.G. and A.P. that Sanny was scared and shaking as he pulled out a gun, which made S.F. and M.H. laugh. S.F. said Sanny was so rattled that he dropped the gun, at which point the "clip" fell out. S.F. told them that Sanny tried to get the clip and run away but S.F. "bum-rushed" Sanny and they got into a fistfight. S.F.

17

also said he expected M.H. to back him up by going for the gun but M.H. did not, and while S.F. and Sanny were on the ground, the gun went off accidently, hitting S.F.

S.G. also testified that during a subsequent conversation with S.F. while he was still staying in A.P.'s apartment, S.F. told her that he and M.H. were planning on "jacking" Sanny. S.G. also said that on two separate occasions, S.F. asked her if she would approach Sanny's father and tell him that S.F. wanted $50,000 and Sanny's truck to testify in a way that would help Sanny. S.G. refused the requests.

After S.G. testified, a portion of her interview with the prosecutor was played for the jury. In the excerpted recording, S.G. said she had a conversation with S.F. where he told her everything that happened the night of the shooting, that S.F. liked to brag about the incident and thought it was funny, and that she had another conversation with S.F. the morning of the interview. The excerpt also included S.G.'s statement that S.F. wanted her to extort Sanny's father for $50,000 and a truck and, in exchange, S.F. would "dip" and not testify. S.G. said that S.F.'s statement was recorded because there was a "really good surveillance system" throughout her residence.

The prosecution also called S.F. to the stand. He admitted multiple felony convictions, including grand theft in 2005, 2008 and 2017, and was openly hostile to the proceedings during his testimony. S.F. told the jury he could not recall any details of the shooting and claimed he did not know S.G. S.F. also denied owing Sanny money for drugs.

In addition, the prosecution played a recording of Cunningham interviewing S.F. on July 17, 2023. During that interview, Cunningham asked S.F. if he told S.G. to tell Sanny's father, "Hey, you give me $50,000. I won't testify." S.F. responded, "Yeah well of course. Who wouldn't try to

18

fuckin' juice their family." S.F. also told Cunningham S.G. was lying when she said that S.F. told her that he and M.H. were trying to rob Sanny and that M.H. attacked Sanny with a machete. S.F. said S.G. was also lying when she told Cunningham S.F. said the magazine dropped out of the gun when Sanny was pointing it at S.F. In addition, he said he did not tell S.G. the gun went off accidently.

Cunningham also called the defense investigator to the stand. The investigator testified that he attempted to talk to S.F. but could not locate him. The investigator also told the jury that he met S.G. for the first time around September 29, 2022, the date of a report he drafted about their meeting. As at trial, S.G. told the defense investigator that S.F. said the gun accidentally fired and that its magazine had fallen out during the altercation that led to the shooting. She also told the investigator about S.F.'s request for her to help him extort Sanny's father for $50,000 and a truck, and she said she did not think S.F. would uphold his end if such a bargain were made. However, the investigator testified S.G. never said M.H. put a machete to Sanny's neck or that M.H. pulled Sanny from his car—only that M.H. had threatened Sanny with the knife. The investigator also stated that S.G. told him that S.F. and another man had robbed S.G. and A.P. in A.P.'s apartment in the summer of 2023.

During cross-examination, the investigator testified that although S.G. had a methamphetamine addiction, he did not believe she was under the influence of drugs when she took the stand in this case, or during his conversations with her. He explained that she seemed to have a hard time communicating and often spoke quickly, adding to the challenge of understanding what she was trying to convey. The investigator, however, testified that she was consistent throughout their interactions about what

S.F. had told her about the night of the shooting, specifically that S.F. admitted attacking Sanny first, S.F. and M.H. started the altercation that led to the shooting, the men intended to rob Sanny, and S.F. wanted to extort Sanny and his family for the promise of favorable testimony in this case.

C. *Defense Case*

Sanny took the stand in his own defense. He told the jury that he struggled with methamphetamine addiction and had been convicted of several prior felonies. Sanny also explained that S.G. was his off-and-on girlfriend for the last seven years, and that S.G. had been romantically involved with A.P. when she and Sanny were not together. Sanny testified that on the day of the shooting, he had used methamphetamine throughout the day and sold drugs at his home in Bonita. In the morning, after not speaking with S.G. for a week or two, they met in the parking lot of a grocery store near the apartment she shared with A.P. and agreed they would get back together as a couple. They made a plan that S.G. would go home to A.P.'s apartment, and Sanny would come back later that day to take her to his home.

Sanny went back to his house and continued to use methamphetamine and work on projects on his property. He testified he and S.G. texted throughout the rest of the day, but he was "lagging" to pick her up. Finally, around 9:00 or 10:00 p.m., Sanny placed his gun in his waistband, grabbed his backpack containing meth, put on sandals, and left in his car to go pick up S.G. Sanny explained he wanted the gun because A.P.'s apartment and neighborhood were dangerous, and Sanny had been robbed in the same area when he was a teenager.

When Sanny arrived at the apartment, he pulled onto 6th Avenue, a small dead-end street, came around a corner, and saw a truck heading

20

toward him.  Sanny recognized M.H. and saw him sitting in the front seat smoking methamphetamine.  Sanny thought M.H. also recognized him and pulled his car behind M.H.'s truck, then parked a few feet behind.

Sanny called S.G., but she did not answer.  M.H. then walked toward the driver's side of Sanny's car holding a machete.  Sanny testified that M.H. "jumped out in a fight stance with a weapon, sweating, and crazy-eyed." Sanny testified he was surprised because although they had been in a prior dispute about M.H.'s girlfriend, he thought the issue was resolved.  Sanny quickly got out of his car, yelled at M.H. to back up, and lifted his shirt to show him the handle of his gun.  Sanny started backing up, then heard "clack, clack, clack, clack" and saw a blue spark coming from the nearby alley.  Sanny saw S.F. heading towards him with the stun gun clacking. Sanny testified that he would not have gone to the apartment if he had known S.F. would be there because of his reputation for "robbing people, stealing" and being "really hard to deal with."

Sanny and S.F. then engaged in a physical fight.  Sanny said that S.F. began "tasing" him in the shoulder, neck, and chin.  Sanny was using his right hand to hold the gun in his waistband in place and only fighting back with his left hand.  While Sanny and S.F. fought, M.H. stood behind Sanny with the machete raised.  Sanny said he thought the men were going to kill him, and he jumped on the sidewalk, pulled his gun out to deter them, and stumbled because of his sandals.  Sanny testified that as he stumbled he must have hit the eject clip button on his gun, causing the clip to fall on the sidewalk.

Sanny said he turned around to pick up the clip, keeping his eyes on S.F. and M.H.  Sanny saw M.H. pacing and Sanny thought he was looking for a way to get behind Sanny.  Sanny thought S.F. was coming towards him to

attack. Sanny testified that as he grabbed the clip with his left hand, and began standing up, he heard the gun in his right hand fire. Sanny could not remember if the clip was back in the gun or still in his hand. Sanny said he did not mean to point the gun at S.F. and the gun fired during the physical struggle. Sanny said he knew he pulled the trigger, but it was unintentional, and he was not trying to kill S.F. After the gun fired, S.F. fell onto the sidewalk.

Sanny said he ran because he knew he was "not looking good right here if the cops show up" since he had an unregistered gun and drugs, and he thought he might get shot and killed by the police. Sanny said he ran to his car to drive away, but he could not find his car key, so he threw everything in his backpack, including the gun and clip, and ran as fast as he could into Balboa Park.

Sanny heard a helicopter and assumed it was looking for him. He flung his backpack, which contained methamphetamine, onto the ground. Then Sanny ran into the bushes in the park, hid the gun in a crevice, crawled under a bush, and fell asleep from exhaustion. He testified he did not hear the police telling him to come out and he was awakened by the police dog biting him.

In addition to Sanny, the defense presented the testimony of Sanny's friend, T.S. Sanny met T.S. in prison, and T.S. was part of the same circle of drug users and knew S.F., S.G., and M.H. T.S. testified that in October 2022, he ran into S.F. in his neighborhood and gave S.F. a ride to Ocean Beach. T.S. told the jury that on the ride, S.F. told him about the shooting. T.S. said S.F. told him that he intended to rob Sanny when he tased him in the face. T.S. also stated that S.F. told him that the clip came out of Sanny's gun and when he tried to put the clip back in, the gun fired accidentally. T.S. also

22

testified that when they arrived in Ocean Beach, T.S. got out of his car to speak with someone else while S.F. stayed in his car. When T.S. returned, S.F. was gone, along with some of T.S.'s belongings.

D. *Verdict, Renewed Motion, and Sentencing*

At the conclusion of the trial, the jury found Sanny (1) not guilty of attempted murder and the lesser included offense of attempted voluntary manslaughter on count 1, (2) guilty of the lesser included offense of resisting arrest under section 148 on count 4, and (3) guilty as charged on counts 2, 3, and 5. As to count 2, the jury also found true allegations that Sanny personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)). Thereafter, Sanny admitted, and the court found true, the out-on-bail allegations charged on counts 2, 3, and 5.

Before sentencing, Sanny renewed his motion to dismiss. Sanny asserted he did not receive a fair trial because the court's ruling denying his initial motion allowed the prosecution to strategically call S.G. to its case in chief, damaging her credibility. Further, the portion of S.G.'s interview with Cunningham that was played for the jury contained statements that were damaging to Sanny's case. Sanny also argued the trial became improperly focused on S.G. and the statements she made to Cunningham and the defense investigator, many of which were unrelated to the charged crimes. Sanny also asserted that he might not have needed to take the stand to explain that he acted only in self-defense if the recording of S.F. had been obtained.

In support of the motion, Sanny also submitted the declaration of the defense investigator, who spoke with the jury's foreperson after trial. The foreperson told the investigator that the jury did not find S.G. credible, and "that the only information they believed from [her] recorded interview was

the assertion that Mr. Sanny was allegedly not 'supposed to be there' and was 'creeping.'"

In opposition to the motion, the prosecution asserted the evidence was not important because the jurors did not find S.F. credible and would not have taken the statements he made to S.G. as true. Further, the jury concluded that even if S.F. attacked him, Sanny used excessive force by firing the weapon. The prosecution also asserted that the remedy provided by the trial court had been sufficient to protect Sanny's rights, and that the jury's verdict and the defense investigator's interview of the foreperson showed that he received a fair trial. Specifically, that interview established that the jury found Sanny and S.F. were engaged in a mutual fist fight, and that Sanny intentionally used excessive force by pulling the trigger of his gun to end the fight.

After argument, the trial court denied the motion. The court again found that the prosecution had engaged in misconduct, but concluded that despite the misconduct Sanny had received a fair trial, and the remedy fashioned to cure the prosecution's wrongdoing was sufficient. The court explained that its decision was based on several facts presented at trial, specifically that M.H. testified that he and S.F. had attacked Sanny before the shooting; S.F. admitted in a recorded statement played for the jury that he attempted to extort Sanny's family; and the medical evidence at trial showed S.F. was shot twice and Sanny admitted on the stand that he had pulled the trigger. The court concluded that "even if the video had been retained, and even if it contained all of the information that it might have that was favorable to the defense, that evidence would not have added significantly to the jury's understanding of the events of the shooting."

The court also noted the jury had deliberated for close to five days, asked multiple thoughtful questions during the deliberation, and listened to "the readback of the testimony of both [M.H.] and Mr. Sanny, at one point sending a note asking whether the use of ... reasonable force ... was a subjective or objective standard and ultimately acquitting Mr. Sanny of three counts, including Count 1, and the LIO of Count 1, both of which required as elements the intent to kill." The court found the jury was not "flippant about the law" or "dismissive of the defense's theory of the case."[9]

The same day, the court sentenced Sanny to a total term of nine years in state prison. The court imposed eight years on count 2, consisting of the low term of two years for the substantive offense, the low term of three years for the firearm use enhancement, and three years for the great bodily injury enhancement. The court imposed a one-year term on count 5, to run consecutively to count 2, and the middle term of three years on count 3 and 364 days in jail on 4, to run concurrently to count 2. Finally, the court struck the out-on-bail enhancements.

Sanny timely appealed from the judgment of conviction.

DISCUSSION

I

*Motion to Dismiss*

Sanny asserts the trial court abused its discretion by denying his motion to dismiss the criminal charges against him because the prosecutor's failure to preserve material, exculpatory evidence deprived him of his rights under the Due Process Clause of the Fourteenth Amendment. Sanny argues that dismissal of the assault conviction was the only viable remedy for

---

9    The court added that the prosecution's opposition made clear that "the People still fail to appreciate and take responsibility for their mistakes in this case."

Cunningham's misconduct of failing to disclose or pursue the exculpatory evidence S.G. attempted to provide during her interview on June 14, 2022.

The Attorney General responds that insufficient evidence supported the trial court's finding that Cunningham destroyed potentially useful evidence in bad faith. Further, the Attorney General argues the trial court did not abuse its discretion by denying Sanny's motion to dismiss because he received a fair trial.

A

*Legal Standards*

"The prosecution's duty to disclose and retain evidence stems from the due process clause of the United States Constitution, as explained and interpreted by the three leading United States Supreme Court decisions on this subject—*Brady, supra*, 373 U.S. 83; *Trombetta, supra*, 467 U.S. 479, and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood* ). [¶] *Brady* is the leading case on the prosecution's duty to disclose exculpatory evidence. '[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' (*Brady, supra*, 373 U.S. at p. 87.) Such evidence must be disclosed if it is material, that is, if there is a reasonable probability the evidence might have altered the outcome of the trial." (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 771 (*Alvarez*).)

"The duty to retain, rather than simply disclose, potentially exculpatory evidence is somewhat different. *Trombetta* concerned a driving under the influence case involving two drivers. The *Trombetta* court found that although breath samples taken from the defendant had not been preserved, the test results were nonetheless admissible. The court rejected the

defendant's argument that the state had a duty to retain the samples for a number of reasons.  The police officers were acting in good faith and according to normal procedure, the chance the samples would have been exculpatory were slim, and the defendants had other means to prove their innocence.  (*Trombetta, supra*, 467 U.S. at pp. 488–490.)  'Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'  (*Id*. at pp. 488–489, fn. omitted.)"  (*Alvarez, supra*, 229 Cal.App.4th at pp. 771–772.)

"*Youngblood*, the most recent of the three cases, explains the requirements for demonstrating a due process violation based on the failure to retain evidence under somewhat different circumstances.  *Youngblood* was a sexual assault case in which the state had failed to properly preserve fluid samples from the victim's clothing and body.  Unlike the situation in *Trombetta*, where the evidence was destroyed after all relevant testing was complete, in *Youngblood*, only limited testing was initially performed to determine whether sexual contact had indeed occurred.  (*Youngblood, supra*, 488 U.S. at p. 53.)  By the time more rigorous testing was attempted, it was no longer possible, because the victim's clothing had been improperly refrigerated.  (*Id*. at p. 54.)  The defendant's principal argument was mistaken identity, and he argued that if the victim's clothing had been properly preserved, the physical evidence might have exonerated him.  (*Ibid*.)

27

The defendant was found guilty, and ultimately, the Supreme Court upheld the conviction." (*Alvarez, supra*, 229 Cal.App.4th at p. 772.)

*Youngblood* held: " 'The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' (*Youngblood, supra*, 488 U.S. at p. 57.) As explained in *Trombetta*, the court noted the problematic nature of determining the materiality of permanently lost evidence. The court also declined to impose on the police an absolute duty to retain and preserve anything that might possibly have some significance. (*Id*. at p. 58.)" (*Alvarez, supra*, 229 Cal.App.4th at p. 772.)

*Youngblood* further held "that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." (*Youngblood, supra*, 488 U.S. at p. 58.) "We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Ibid*.) *Youngblood* concluded that the conduct of the police in that case could, at worst, be characterized as negligent, not bad faith. (*Ibid*.)

"Thus, there is a distinction between *Trombetta*'s 'exculpatory value that was apparent' criteria and the standard set forth in *Youngblood* for 'potentially useful' evidence.  If the higher standard of apparent exculpatory value is met, the motion is granted in the defendant's favor.  But if the best that can be said of the evidence is that it was 'potentially useful,' the defendant must also establish bad faith on the part of the police or prosecution." (*Alvarez, supra*, 229 Cal.App.4th at p. 773.)

"A trial court's ruling on a *Trombetta* [or *Youngblood*] motion is upheld on appeal if a reviewing court finds substantial evidence supporting the ruling." (*People v. Montes* (2014) 58 Cal.4th 809, 837 (*Montes*).)  " 'In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value' in support of the court's decision. [Citation.]  ' " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*Alvarez, supra*, 229 Cal.App.4th at p. 774.)

"With respect to the proper remedy, courts have a large measure of discretion in determining the appropriate sanction for failure to preserve material evidence.  (*People v. Memro* [(1995)] 11 Cal.4th [786,] 831.)  A dismissal on due process grounds may be improper if a less drastic alternative is available that still protects the defendant's right to due process.  (See [*United States*] *v. Kearns* (9th Cir.1993) 5 F.3d 1251, 1254.)  Many cases have acknowledged the ability of courts to administer ameliorative jury instructions.  (See *Youngblood, supra*, 488 U.S. at p. 60 (conc. opn. of Stevens, J.); *People v. Montes, supra*, 58 Cal.4th at p. 837.)" (*Alvarez, supra*, 229

29

Cal.App.4th at pp. 778–779.) However, if an instruction would pale in comparison to the potential value of the destroyed evidence, dismissal is warranted. (*Ibid.*, citing [*United States*] *v. Cooper* (9th Cir. 1993) 983 F.2d 928, 932 [proposed jury instruction would pale in comparison to destruction of lab equipment, which deprived defendants of the ability to establish their innocence because experts could not determine by viewing photographs whether or not the lab was constructed for methamphetamine production]; and *U.S. v. Bohl* (10th Cir. 1994) 25 F.3d 904, 914 [bad faith destruction of evidence required dismissal because the effect of destruction and dearth of adequate secondary evidence violated the defendants' due process rights].)

B

*Analysis*

1. *Bad Faith*

No party challenges the trial court's determination that the withheld evidence was potentially useful to Sanny—and therefore material under *Youngblood*. Thus, we need not reach this facet of the court's ruling. The Attorney General does argue, however, that there was insufficient evidence to support the trial court's finding that Cunningham acted in bad faith when she failed to disclose the information to Sanny or pursue the video S.G. tried to show her during the interview. This argument is without merit.

As the trial court thoroughly explained in its order denying the motion to dismiss without prejudice, during the interview, S.G. informed Cunningham that a video of her conversations with S.F. existed and that she had access to the video at that moment. Cunningham immediately recognized the evidence was potentially exculpatory, stating to S.G.'s counsel that the video "sounded like *Brady* material and that she needed to 'get it and turn it over.'" S.G. twice told Cunningham she had the video on her

30

phone, and attempted to show it to Cunningham, but Cunningham refused to let S.G. show her the video. Despite wanting to provide the video to the prosecutor, Cunningham did not let S.G. turn it over. Further, no one from the prosecutor's team or law enforcement took the phone into evidence, nor did Cunningham inform the detective on the case of the evidence. Additionally, no one contacted S.G. after the interview to obtain the videos or get further information about them.

As the Attorney General states in his brief, "the presence or absence of bad faith necessarily turns on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. ([*People v.*] *Frye* [(1998)] 18 Cal.4th [894,] 943; *Montes, supra*, 58 Cal.4th at p. 838.) And bad faith is shown if the police by their own conduct indicate that the evidence could form a basis for exonerating the defendant and then fail to take any steps to preserve it. (*Alvarez, supra*, 229 Cal.App.4th at p. 777.)" Here, at the time of the interview, Cunningham both recognized the evidence's exculpatory value and had exclusive knowledge of its existence, yet she did not inform the defense. This evidence was sufficient to support the court's finding that Cunningham's failure to take any action to secure the videos from S.G. was more than negligent, and that Cunningham acted in bad faith.[10]

_____

[10] The parties both point to *Alvarez, supra*, 229 Cal.App.4th 761, to support their positions on the issue of bad faith. In that case, one of the defendants, who was charged with robbery, asked police at the scene to obtain video from a security camera in the vicinity operated by the police, which the defendant said would show his innocence. (*Id*. at p. 764.) The officer told the defendant at the scene that obtaining video footage from the camera was part of his job, but the officer failed to follow up at all, asserting it was not his responsibility. (*Ibid*.) The video was no longer available by the time the case was assigned to an investigating detective, and the defendant successfully moved to dismiss the case based on *Youngblood*. (*Ibid*.)

The Attorney General asserts that insufficient evidence supported the court's finding that Cunningham acted in bad faith because she asked the District Attorney Investigator, Blackwell, to find out if the video could be obtained from Wyze, then checked with him to see if he had made any progress. However, this evidence does not negate the evidence relied on by the trial court to find bad faith, particularly the fact that Cunningham made *no* effort to obtain the video from S.G. (See *People v. Avila* (2009) 46 Cal.4th 680, 703 [" 'if the circumstances reasonably justify the … findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding' "].)

2. *Proper Remedy*

Sanny asserts the only appropriate remedy for the prosecutor's misconduct was dismissal of the assault charge. We disagree. As in *Youngblood*, "[t]his is not a case where evidence initially gathered was destroyed. The issue here is the asserted failure of the police [or the prosecutor] to collect relevant exculpatory evidence." (*Montes, supra*, 58 Cal.4th at p. 837.) Although the California Supreme Court has "suggested

---

On appeal, the Attorney General argued that bad faith had not been established, and that at most the officer was negligent. (*Alvarez, supra*, 229 Cal.App.4th at p. 777.) The Court of Appeal rejected this argument, concluding sufficient evidence supported the court's finding of bad faith. (*Ibid*.) In particular, in addition to the defendant asking for the video on the night of the robbery, the defense had asked the prosecution to provide any video the police obtained from the area just a few days after the robbery. However, neither the prosecution nor the police ever took any steps to obtain the video. Importantly, when the defendant asked the police officer to get the video, the officer explicitly recognized it "could form a basis for exonerating the defendant." (*Id*. at p. 777.) Likewise here, Cunningham also explicitly recognized the exculpatory nature of the evidence S.G. disclosed and yet took no steps to obtain the evidence from her. As discussed, Cunningham's actions in this case support the trial court's finding of bad faith.

that cases may arise in which the failure to collect evidence could justify sanctions against the prosecution at trial," we agree with the Attorney General that the trial court properly exercised its discretion when it denied Sanny's renewed motion to dismiss because, in light of the evidence adduced at trial, the remedies provided by the court adequately protected his right to a fair trial. (*Ibid.*)

As stated, courts have a large measure of discretion to determine the appropriate sanction for failure to preserve material evidence. (*People v. Memro, supra,* 11 Cal.4th at p. 831; *Alvarez, supra,* 229 Cal.App.4th at p. 778.) A dismissal may be improper if a less drastic alternative, such as an ameliorative jury instruction, can protect the defendant's right to due process. (*Alvarez,* at pp. 778–779.) Here, the court's decision to instruct the jury with CALCRIM No. 306 informed the jury Cunningham had "withheld from defense counsel an audio-recorded interview with witness [S.G.] conducted on June 14, 2022. The interview contained evidence favorable to Mr. Sanny's defense and referenced a video recording of statements made by [S.F.] to [S.G.] The audio-recorded interview was not provided to defense counsel until June 29, 2023, the day originally set for trial. By the time defense counsel learned of the video recording, the video recording had been permanently destroyed." The instruction also told the jury it could consider this information in its deliberations.

The trial court also allowed the defense to play portions of the interview that corroborated the jury instruction, and in which S.G. explained that the video would have shown S.F. telling her everything about the night of the shooting, that S.F. thought the shooting was funny, that he and M.H. had attacked S.F., and S.F. telling her that he wanted S.G. to extort $50,000 and Sanny's truck from Sanny's father in exchange for helping him with his

33

case. In addition, S.G.'s trial testimony further clarified what she meant when she said Sanny told her everything that happened the night of the shooting. S.G. testified that during multiple video-recorded conversations with S.F., he told her that he and M.H. attacked and attempted to rob Sanny and that the gun fired accidently when he and Sanny were fighting.

Thus, as the trial court explained in its ruling denying the renewed motion to dismiss, the jury was informed that the destroyed video evidence would show S.F. telling S.G. that: (1) he, in order not to testify, wanted S.G. to ask Sanny's father for $50,000; (2) Sanny fired the gun accidentally; and (3) he and M.H. attacked Sanny intending to rob him. Those three assertions were relevant to the case because defense counsel argued Sanny was not guilty of count 2 since he was acting in self-defense. Conversely, the prosecutor argued Sanny was the initial aggressor, engaged in mutual combat, and, even if he was attacked first, used excessive force in firing the first gunshot or, at the very least, in firing the second gunshot, which required insertion of the magazine.

With respect to S.F.'s statement that he wanted to extort Sanny and his family, as the trial court stated in its ruling, S.F. admitted during his interview with the prosecution, which was played for the jury, that he told S.G. he would not testify if he received $50,000. Because S.F.'s own admission to that statement was evidence that would have been cumulative to any evidence showing him on video making that statement to S.G., the failure to preserve that video evidence did not prevent Sanny from receiving a fair trial.

With respect to the second fact at issue, that S.F. thought the gun was accidently fired, S.G. testified S.F. told her that he and M.H. had attacked Sanny, M.H. held a machete to Sanny's neck, S.F. tased Sanny in the face,

34

and S.F. believed Sanny shot him accidentally. Additionally, the defense investigator testified that S.G. told him that S.F. had told her that the gun was fired accidentally. T.S. also testified that S.F. told him the same story. Thus, as the trial court concluded, despite the credibility problems S.G. suffered, the defense investigator's and T.S.'s testimony corroborated S.G.'s testimony, reducing any harm caused by Cunningham's failure to preserve the video evidence.

Regarding the third fact, that M.H. and S.F. attacked Sanny, the harm caused by the failure of Cunningham to preserve the video was minimized by S.G.'s testimony that S.F. told her he planned to rob Sanny, which was also corroborated by the defense investigator's testimony. Further, M.H. himself testified that he called S.F. to help him defend himself against Sanny, then M.H. got out of his vehicle while holding a machete in a threatening manner at shoulder level, and that he continued to stand behind Sanny and hold the machete while he fought S.F. As the trial court stated in its ruling, the physical evidence found at the crime scene—the machete and the taser—also corroborated this version of events. Thus, the missing evidence, i.e., statements S.F. might have made on video indicating that S.G. and M.H. attacked Sanny, would have been cumulative to the trial evidence. We cannot say that the court's well-reasoned determination that these factors showed Sanny received a fair trial despite Cunningham's misconduct was an abuse of its discretion.

In addition, as the trial court explained in its ruling, the jury's long deliberations, multiple thoughtful questions and requested read-backs of key testimony, and the ultimate acquittal of Sanny on count 1 for attempted murder and its lesser included offense of attempted voluntary manslaughter, shows the jury gave serious consideration to Sanny's self-defense claim and

35

accepted it for purposes of the most serious charge. The fact that the jury's foreperson after trial indicated that they spent " 'very little time discussing the alleged video that was mentioned at the end of trial' " and " 'were confused about the mention of the missing evidence,' " does not show the court's decision was an abuse of discretion. Rather, it is notable that the jury did consider the prosecution's actions, evidenced by the fact that it was discussed. Again, the jury's questions and relatively long deliberation and acquittals show it gave serious consideration to Sanny's defense.

In sum, we hold the trial court properly and thoughtfully exercised its discretion when it denied Sanny's renewed motion to dismiss count 2 because, in light of the evidence adduced at trial, the remedies provided Sanny a fair trial.

## II

### *Section 654*

Sanny also asserts that the punishment imposed for count 3, possession of a controlled substance while armed with a firearm, was barred by section 654 because the offenses were committed during the same course of conduct incident to a single objective. On count 2, the principal count of assault with a firearm, the trial court imposed the low term of two years, plus the terms for two enhancements, for a total term of eight years. On count 3, the court imposed the middle term of three years, to run concurrently to the term on count 2 and expressly found that the term on count 3 was not barred under section 654.

Section 654, subdivision (a), precludes multiple punishment when the defendant commits different acts that violate different statutes, but the acts comprise an indivisible course of conduct committed with a single intent and objective. (*People v. Latten* (2021) 63 Cal.App.5th 574, 577.) Whether a

course of criminal conduct is divisible depends on the intent and objective of the defendant. (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 229.) If the defendant committed all the offenses with one objective, he or she can only be punished for one of them. (*Ibid.*) On the other hand, if a defendant committed multiple offenses with multiple objectives, then he or she may be punished for each offense. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

If the defendant commits two crimes, and punishment for one of the crimes is precluded under section 654, the statute requires the sentence for one conviction to be imposed, and the sentence for the other conviction to be imposed and then stayed. (*People v. Deloza* (1998) 18 Cal.4th 585, 594.) Section 654 applies to concurrent and consecutive sentences. (*Ibid.*) A trial court's section 654 ruling is a factual question that this court reviews for substantial evidence. (*People v. Phung* (2018) 25 Cal.App.5th 741, 760–761.)

Here, the objective of possessing the gun as to count 3 was self-protection in the sale of methamphetamine. During his testimony, Sanny told the jury "I purchased the gun just for safety." He explained that in the drug world in which he operated, "a lot of gang-related people you see in that circle are just robbing and stealing, and they will do anything to get whatever you have." As related to count 3, Sanny's possession of the gun for self-protection was coupled with his knowing possession "of methamphetamine to use or sell." (See *People v. Bland* (1995) 10 Cal.4th 991, 1005 ["Drug dealers are known to keep guns to protect not only themselves, but also their drugs and drug proceeds; ready access to a gun is often crucial to a drug dealer's commercial success."].) By contrast, the evidence showed the objective in possessing the gun as to count 2 was the use of the weapon to shoot S.F. Because there was substantial evidence that count 3 was committed with a

different intent and objective than count 2, the trial court properly found that the concurrent sentence on count 3 was not barred under section 654.

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

KELETY, J.